562 So.2d 331 (1990)
Richard Barry RANDOLPH, Appellant,
v.
STATE of Florida, Appellee.
No. 74083.
Supreme Court of Florida.
May 3, 1990.
Rehearing Denied July 9, 1990.
*332 James B. Gibson, Public Defender and James R. Wulchak, Chief, Appellate Div., Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Sean Daly, Asst. Atty. Gen., Daytona Beach, for appellee.
BARKETT, Justice.
Richard Barry Randolph appeals his convictions for the sexual battery and first-degree murder of Minnie Ruth McCollum, and appeals the imposition of the death penalty.[1] We affirm the convictions and sentence of death.
Minnie Ruth McCollum managed a Handy-Way store in Palatka, and Randolph was a former employee of the same store. Shortly after 7 a.m. on August 15, 1988, Terry Sorrell, a regular customer, and Dorothy and Deborah Patilla, custodians of the store, observed Randolph, wearing a Handy-Way smock, locking the front door. When the Patillas inquired about Mrs. McCollum's whereabouts and why the store was locked, Randolph told them that Mrs. McCollum's car had broken down and that she had taken his car. He indicated that he had repaired her car and was leaving to pick her up. Randolph then drove away in Mrs. McCollum's car.
The women tried the door and, finding it locked, peered in through the window. They saw that the security camera in the ceiling was pulled down; wires were coming out of the trash can, which had been tipped over; the area behind the counter was in disarray; and the door to the back room, normally kept open, was almost completely closed. Thinking that something was awry, they called the sheriff's office.
After breaking into the store, a deputy found Mrs. McCollum lying on her back, naked from the waist down, with blood coming out of the back of her head and neck. She was breathing and moaning slightly. The deputy also observed a knife beside her head. Paramedics transported Mrs. McCollum to the hospital.
Dr. Kirby Bland, a general surgeon, testified that Mrs. McCollum arrived at the *333 emergency room comatose, and with her head massively beaten and contused. She had multiple skin breaks and skin lacerations about the scalp, face, and neck and her left jawbone was fractured. Dr. Bland indicated that Mrs. McCollum had knife lacerations to the left side of her neck that caused a hematoma around the heart. There was also a stab wound in the area of the left eye. Dr. Albert Rhoten, Jr., a neurologist, testified that in twenty years of neurosurgical practice he had not seen brain swelling so diffuse, and he likened it to someone who had been ejected out of a car or thrown from a motorcycle and received multiple hits on the head. Mrs. McCollum died at the hospital six days after the assault.
After leaving the Handy-Way, Randolph drove Mrs. McCollum's car to the home of Norma Janene Betts, Randolph's girlfriend and mother of their daughter. She testified that he admitted robbing the Handy-Way store and attacking Mrs. McCollum. He told her that he was going to Jacksonville to borrow money from the manager of a Sav-A-Lot grocery store and cash in lottery tickets. He promised to return to take Betts and their daughter to North Carolina.
Betts also testified that while they lived in North Carolina Randolph was a "nice young man" and was employed. After they moved to Palatka, he began socializing with the wrong crowd, became addicted to crack cocaine, and changed altogether. On the morning of the incident, she testified, Randolph did not appear to be under the influence of crack cocaine, but she did not know whether he had taken any cocaine between 11 p.m. the night before and 6 a.m. the morning of the incident.
Randolph was arrested in Jacksonville at a Sav-A-Lot store, while waiting for the manager to advance him some money. After waiving his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Randolph gave a statement to two Putnam County detectives. Detective William Hord testified that Randolph had said he had ridden his bicycle to the Handy-Way store with a toy gun, which he hid behind the store. He said he knew the routine at the store, having worked there, and knew there should be approximately $1,000 in the safe. He planned to enter the store unseen, open the safe, remove the money, and leave while the manager was outside checking the gas pumps. However, the manager returned and saw him. He rushed her, she panicked, and a struggle ensued. Randolph indicated that she was "a lot tougher than he had expected," but that finally he forced her into the back room where he hit her with his hands and fists until she "quieted down."
Randolph tried unsuccessfully to open the store safe. When Mrs. McCollum started moving again, he approached her. He said that she pulled the draw string out of his hooded sweat shirt, which he then wrapped around her neck until she stopped struggling. Randolph then found a slip of paper with the combination of the safe. Unsuccessful in opening it, he took the store's lottery tickets.
At this point, the victim started screaming. Randolph again struck her until "she hushed." Because she continued to make noises, Randolph grabbed a small knife and stabbed her. He again grabbed the string and "tried to cut her wind." To make it appear as if "a maniac" had committed the crime, Randolph said he then raped her. He put on a Handy-Way uniform, grabbed the store video camera out of its mount and put it into the garbage. He took Mrs. McCollum's keys and locked the store before leaving in her car.
On the way to Jacksonville, Randolph stopped at several convenience stores where he cashed in winning lottery tickets and discarded the losing tickets, and at a McDonald's where he disposed of his bloodstained clothing and shoes. The sheriff's detectives recovered the lottery tickets and articles of clothing when they returned to Putnam County with Randolph.
During the penalty phase, the state called the medical examiner, who testified that Mrs. McCollum died as the result of severe brain injury. He also described the *334 extensive bruises to Mrs. McCollum depicted by a series of photographs.
Randolph presented the testimony of Dr. Harry Krop, a psychologist who examined Randolph. He opined that none of the statutory mitigating circumstances existed, although several nonstatutory circumstances most likely contributed to the offense. He testified that Randolph, who was adopted when he was five months old, had problems getting along with people in school, and his behavior problems caused him to be referred to psychotherapy for a year in the third grade. His mother was emotionally unstable and was hospitalized for psychiatric reasons on a number of occasions, and his father was physically abusive, and administered discipline by tying him and beating him with his hands, a broomstick, and a belt.
Despite his emotional deficiencies, Randolph graduated from high school. He received an honorable discharge from the Army; however, he started using drugs during his service, including marijuana and cocaine. In 1984 he began using highly-addictive crack cocaine. Dr. Krop testified that, unlike alcohol intoxication, crack cocaine's effects are not readily apparent from merely looking at a person. When someone regularly uses crack cocaine, the effects of the drug stay in the blood; one's personality and behavior are affected, not necessarily by an immediate ingestion of the drug, but rather by its use over time. He believed that Randolph's abnormal personality was greatly influenced by his drug addiction at the time of the offense.
Dr. Krop further testified that Randolph regretted what had happened; he was ashamed and embarrassed that he had lost control, and was remorseful about what he had done. The psychologist believed that Randolph had nothing against Mrs. McCollum, that he fully intended only to enter the store and steal the money while she was outside, but that things happened that caused him to panic. He concluded that Randolph's criminal behavior was influenced by his drug addiction.
The jury found Randolph guilty of first-degree murder, armed robbery, sexual battery with force likely to cause serious personal injury or with a deadly weapon, and grand theft of a motor vehicle.[2] The jury recommended the death penalty by a vote of eight to four. The judge accepted the jury recommendation and imposed the death penalty, finding four aggravating circumstances,[3] no statutory mitigating circumstances, and two nonstatutory mitigating circumstances.[4]

GUILT PHASE
Randolph raises three claims of error that he asserts require reversal. First, he contends that the trial court violated state and federal due process protections by excusing for cause a prospective juror who expressed her repugnance to the death penalty, but said she could still vote to impose it in an appropriate case. Randolph argues that prospective jurors may not be excluded for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986); Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). He suggests that reversal is mandated by Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).
Gray involved the erroneous Witherspoon exclusion of a qualified prospective *335 juror. The Court held that the appropriate constitutional standard is not whether a prospective juror would have difficulty imposing the death penalty, but whether that person's "`views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."'" Id. 107 S.Ct. at 2051 (quoting Wainwright v. Witt, 469 U.S. 412 at 424, 105 S.Ct. 844 at 852, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980))). The Court noted that:
It is necessary, however, to keep in mind the significance of a capital defendant's right to a fair and impartial jury under the Sixth and Fourteenth Amendments.
Justice REHNQUIST, in writing for the Court, recently explained:
"It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986).]
The State's power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would "frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths." Wainwright v. Witt, 469 U.S. [412, 423, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985)]. To permit the exclusion for cause of other prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members. It "stack[s] the deck against the petitioner. To execute [such a] death sentence would deprive him of his life without due process of law." Witherspoon v. Illinois, 391 U.S., at 523 [88 S.Ct. at 1778].
Gray, 107 S.Ct. at 2051 (emphasis added).
We agree that prospective jurors who believe the death penalty is unjust may serve as jurors and cannot be excluded for cause because of that belief. However, if that belief prevents them from applying the law and discharging their sworn duty, the trial court is obliged to excuse them for cause. In this case, the pertinent colloquy pertaining to juror Hampton began:
MR. TANNER [prosecutor]: ... .
If you sat as a juror in this case would you be able to consider imposing the death penalty?
[Juror Hampton]: Oh, yes.
MR. TANNER: Okay. With regard to  to your feelings about the death penalty could you put that aside totally in the first part of the trial where you're deciding guilt or innocence; could you put that aside?
[Juror Hampton]: (Nods head.)
MR. TANNER: Okay. I'm not asking you to tell me what you'd do in this case because, one, that would be unfair, you haven't heard the evidence; and, number two, it would be improper.
But if in an appropriate case  and let's step away from this case for a moment  you believe that the facts and the circumstances warranted it, consistent with the Judge's instructions, that you would be able to render a verdict calling for the death penalty?
[Juror Hampton]: Yes.
The prosecutor turned to juror Trevora and asked:
MR. TANNER: ... .
Would you refuse to vote in favor of the death penalty in every case, in every instance?
[Juror Trevora]: I think so.
MR. TANNER: Okay. In other words, you would  you don't believe that you would ever be able to vote in favor of the death penalty?
[Juror Trevora]: I don't think so.
MR. TANNER: Do any of the other jurors feel that way?
[Juror Trevora]: Yes.
THE VENIRE: No.
MR. TANNER: Mrs. Hampton, I saw kind of a yes. Do you feel that way?
[Juror Hampton]: Yes.

*336 MR. TANNER: Let me ask you same [sic] questions to be sure I understand what you've said... .
Are you saying, Mrs. Hampton, that really you could never vote for the death penalty in any case; is that what you're saying?
[Juror Hampton]: It would really be against my will.
MR. TANNER: It would be against your personal  personal standards?
[Juror Hampton]: Yes.
After the state tendered the jury panel, defense counsel addressed jurors Trevora and Hampton:
MR. PEARL: Now, Miss Trevora, it's necessary to ask you  and you, Miss Hampton, in turn  whether your feelings about the death penalty, your reluctance, let us say, to vote for the death penalty is absolute in every case, or isn't it really a matter of degree rather than absolute, something that is absolute in your mind?
Let me give you an example, and let me ask you. Suppose that instead of Richard Randolph over here that you had already found a person guilty, as a member of the jury, and as you said you could do that if you had to regardless of what might follow, and it turned out that it was a Manson who had committed a  many brutal murders in California, or a Bundy, who it is said has killed perhaps a hundred women, or a Stano  I represented Stano  who I'm sure killed at least forty people.
I'm talking about vicious, malicious, serial killers who can never be rehabilitated, they will be like a wolf loose amongst the sheep if they live.
Now, if you were faced with having to decide sitting on a jury that those people  or Adolph Hitler who is responsible for twenty million deaths  could you then under the circumstances that that was so heinous, so evil, so wicked, that the person involved was so little of a human being, that could you then vote for the death penalty in such an extreme case?
[Juror Trevora]: No.
MR. PEARL: Miss Hampton?
[Juror Hampton]: I hated mighty bad to hear of even Bundy being electrocuted. It made me sick. I didn't feel good.
... .
... I just couldn't rejoice in somebody being electrocuted.
MR. PEARL: Yes, ma'am. Of course, no one  I guess you understand that no one expects you, or any person, any civilized person, any feeling person, to rejoice over the taking of a life, no matter how well-deserved. That is not 
What you saw or heard about out there in connection with this fellow Ted Bundy was certainly not something that 99 percent of us could approve of. I'm not talking about that.
I'm talking about the necessity, perhaps, in certain cases, and limited numbers of cases, where the State must judicially, even if sadly, take a man's life because it is felt that that is the only appropriate response to what that person had done.
Now, I'm not talking about enjoying it. I'm not talking about getting out and celebrating when it happens. I'm sure that you, like most people, feel life has value, that any life has value, and that none should be wasted.
But still the question we come back to, and that we must revisit, is the question whether in extreme circumstances could you then vote for the death penalty simply because no other punishment, no other response to the activities of the defendant would be appropriate?
[Juror Hampton]: I guess so.
MR. PEARL: You say  your answer was, ma'am, you guess so?
[Juror Hampton]: Right.
MR. PEARL: Did I  did I quote you correctly?
[Juror Hampton]: Yes.
The state moved to excuse juror Hampton for cause. The trial court granted the state's motion, concluding that juror Hampton "vacillated badly," and that she "couldn't do it" if asked to impose the death penalty.
*337 We cannot say, based on this colloquy, that the trial court abused its discretion. The trial court had the opportunity to evaluate the demeanor of the prospective juror, and given juror Hampton's equivocal answers, we cannot say that the record evinces juror Hampton's clear ability to set aside her own beliefs "in deference to the rule of law." Buchanan v. Kentucky, 483 U.S. 402, 107 S.Ct. 2906, 2914, 97 L.Ed.2d 336 (1987); Gray, 107 S.Ct. at 2051; McCree, 476 U.S. at 176, 106 S.Ct. at 1766.[5] We reject Randolph's first claim of error.
Randolph next argues that the trial court erred in denying his motion for individual voir dire. The granting of individual and sequestered voir dire is within the trial court's sound discretion. Davis v. State, 461 So.2d 67, 69 (Fla. 1984); Stone v. State, 378 So.2d 765, 768 (Fla. 1979), cert. denied, 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed.2d 250 (1980). Randolph has not shown an abuse of discretion by the trial court that warrants reversal. Davis, 461 So.2d at 70. See also Cummings v. Dugger, 862 F.2d 1504, 1508-09 (11th Cir.) (noting that the preferred approach in the face of extensive pretrial publicity is to conduct individual examination, although declining to require individual voir dire in all cases where there is substantial pretrial publicity), cert. denied, ___ U.S. ___, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989); United States v. Holman, 680 F.2d 1340, 1347 (11th Cir.1982) (same).
In this case, the trial court indicated that it would reconsider the motion for individual voir dire if there was a need to do so based upon a showing of pretrial publicity and the prospective jurors' knowledge of the case. At the time of the defense motion for individual voir dire, there was no factual basis demonstrating that jurors might have been tainted. The defense never renewed its motion. We find no abuse of discretion.
Randolph likewise has failed to demonstrate an abuse of discretion in the denial of the motion for mistrial when a prospective juror stated that she had heard that the victim had been "brutally murdered." The prospective juror made clear that that was the extent of the comment she had heard. The statement did not relate to Randolph's culpability but merely briefly described the nature of the crime. That prospective juror subsequently was excused and we do not find that this brief comment describing the murder as brutal was sufficient to taint the venire. We find no error.
We reject Randolph's third and fourth contentions as meritless: that the trial court should have reduced the charge of sexual battery with great force[6] to sexual battery where the victim is physically helpless to resist,[7] and should have granted Randolph's motion for mistrial made upon the prosecutor's rebuttal at final argument pertaining to whether Mrs. McCollum's medical treatment was the cause of her death.
Finally, Randolph argues that the trial court erred in denying his motion for mistrial after the state elicited testimony during the guilt phase that Randolph did not exhibit remorse. During redirect examination, the prosecutor asked Randolph's girlfriend, Norma Janene Betts:
Q: Did [Randolph] act remorseful or ashamed, or anything, sad for what he had done?
A: No.
Defense counsel immediately objected to the question and answer, arguing that the testimony was irrelevant to the issue of guilt. The prosecutor responded that the question was directed to defense counsel's attempt during cross-examination to show that Randolph was under the influence of crack cocaine. He argued that the question was intended to demonstrate that Randolph was in control of his faculties, that he knew what he was doing, and that Randolph's remorse, or lack of it, was therefore relevant to the issue of premeditation. *338 The court sustained the objection, but denied the motion for a mistrial. Randolph contends that a mistrial should have been granted.
The court clearly was correct in sustaining Randolph's objection. Walton v. State, 547 So.2d 622, 625 (Fla. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990); Robinson v. State, 520 So.2d 1, 6 (Fla. 1988); Patterson v. State, 513 So.2d 1257, 1263 (Fla. 1987); Pope v. State, 441 So.2d 1073, 1078 (Fla. 1983). However, a motion for mistrial is directed to the sound discretion of the trial court. Johnston v. State, 497 So.2d 863, 869 (Fla. 1986); Salvatore v. State, 366 So.2d 745, 750 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). On this record, the trial court heard argument at a side-bar conference and warned the prosecutor not to mention remorse again. The prosecutor heeded the court's warning and in this case we find the improper question was harmless beyond a reasonable doubt in both the guilt and penalty phases. State v. DiGuilio, 491 So.2d 1129, 1138 (Fla. 1986).
There was substantial competent evidence in the record to support each verdict. Accordingly, we affirm the convictions for first-degree murder, armed robbery, sexual battery with force likely to cause serious personal injury or with a deadly weapon, and grand theft of a motor vehicle.

PENALTY PHASE
Randolph asserts that six errors in the penalty phase require us to vacate his death sentence. First, Randolph contends that the trial court improperly admitted irrelevant and prejudicial photographs of Mrs. McCollum's body taken during the autopsy. The photographs were relevant to prove the violent and extensive nature of the injuries inflicted, and tended to support the state's claim that the murder was heinous, atrocious, or cruel. We find no abuse of discretion by the trial court in admitting these photographs. Wilson v. State, 436 So.2d 908, 910 (Fla. 1983) (admission of photographic evidence is within the trial court's discretion, which will not be disturbed absent a showing of abuse).
Randolph also argues that the state improperly questioned the medical examiner concerning the effects of administering type-O blood to Mrs. McCollum while she was in the hospital. The state responds that the medical examiner's testimony was proper to refute defense counsel's guilt phase closing argument that the hospital "finished [Mrs. McCollum] off" by administering the wrong type of blood. During the penalty phase, the state is limited to introducing evidence that proves an aggravating circumstance or rebuts a mitigating circumstance argued by the defendant. Fitzpatrick v. Wainwright, 490 So.2d 938, 940 (Fla. 1986); Trawick v. State, 473 So.2d 1235, 1240-41 (Fla. 1985), cert. denied, 476 U.S. 1143, 106 S.Ct. 2254, 90 L.Ed.2d 699 (1986); Dougan v. State, 470 So.2d 697, 701 (Fla. 1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 900 (1986). Defense counsel introduced no mitigating evidence regarding emergency blood transfusions in the penalty phase. However, under these circumstances, we conclude that the error did not affect the jury's recommendation and was harmless beyond a reasonable doubt. DiGuilio, 491 So.2d at 1138.
We also find as meritless Randolph's claim that the trial court considered inappropriate aggravating circumstances. He contends that the trial court could not have found that the murder was heinous, atrocious, or cruel. He argues that we have rejected this factor in other instances when the cause of death was either by bludgeoning or strangulation, and when there was no evidence that the victims were aware of their impending death. However, in none of the cases cited by Randolph was the victim repeatedly hit, kicked, strangled, and knifed. We find that the trial court properly found this aggravating circumstance. Perry v. State, 522 So.2d 817 (Fla. 1988) (victim was choked and repeatedly stabbed and was severely beaten while warding off blows); Wilson v. State, 493 So.2d 1019 (Fla. 1986) (victim was brutally beaten while attempting to fend off blows before being fatally shot).
*339 We reject the following claims as meritless and warranting no discussion: the trial court erred in refusing to instruct the jury separately on specific nonstatutory circumstances, see Jackson v. State, 530 So.2d 269, 273 (Fla. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 882, 102 L.Ed.2d 1005 (1989); this Court's review of cases imposing the death penalty is arbitrary and capricious because the jury was not required to make written findings, see Hildwin v. Florida, ___ U.S. ___, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) (the sixth amendment does not require juries to make specific findings authorizing the imposition of the death penalty); the aggravating factor of heinous, atrocious, or cruel is unconstitutionally vague under state and federal constitutions, see Smalley v. State, 546 So.2d 720, 722 (Fla. 1989); the trial court improperly found aggravating circumstances and failed to find various mitigating circumstances; and Florida's capital sentencing statute is unconstitutional on its face and as applied. Mendyk v. State, 545 So.2d 846, 850 (Fla.), cert. denied, ___ U.S. ___, 110 S.Ct. 520, 107 L.Ed.2d 521 (1989).
We affirm Randolph's convictions and the sentence of death imposed for the murder of Minnie Ruth McCollum.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
NOTES
[1] We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
[2] The trial court imposed a sentence of nine years' incarceration on the armed robbery count, and twenty-seven years' incarceration on the sexual battery count, to run concurrent with the sexual battery term. No sentence was imposed on the conviction for grand theft.
[3] Murder during commission or flight after commission of a sexual battery, section 921.141(5)(d), Florida Statutes (1987); murder committed to avoid or prevent lawful arrest, section 921.141(5)(e), Florida Statutes (1987); murder committed for pecuniary gain, section 921.141(5)(f), Florida Statutes (1987); murder especially heinous, atrocious, or cruel, section 921.141(5)(h), Florida Statutes (1987).
[4] Randolph possesses an atypical personality disorder and expressed shame and remorse for his conduct.
[5] Defense counsel conceded that juror Hampton vacillated between her ability and inability to vote for the death penalty.
[6] § 794.011(3), Fla. Stat. (1987).
[7] § 794.011(4)(a), Fla. Stat. (1987).