705 So.2d 1337 (1997)
Pablo SAN MARTIN, Appellant,
v.
STATE of Florida, Appellee.
No. 83611.
Supreme Court of Florida.
December 24, 1997.
Rehearing Denied February 23, 1998.
*1340 Lee Weissenborn, Miami, for Appellant.
Robert A. Butterworth, Attorney General, and Randall Sutton, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
We have on appeal the judgment of the trial court adjudicating Pablo San Martin guilty of first-degree murder and other crimes and sentencing him to death. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
*1341 San Martin, along with codefendants Leonardo Franqui and Pablo Abreu, was charged with one count of first-degree murder, two counts of attempted first-degree murder with a firearm, one count of attempted robbery with a firearm, two counts of grand theft, and one count of unlawful possession of a firearm while engaged in a criminal offense. Prior to trial, Abreu negotiated a plea with the State and subsequently testified during the penalty phase about the planning of the offenses. San Martin and Franqui were tried jointly.
The following facts were established at the trial of San Martin and Franqui. Danilo Cabanas Sr., and his son Danilo Cabanas, Jr., operated a check-cashing business in Medley, Florida. On Fridays, Cabanas Senior would pick up cash from his bank for the business. After Cabanas Senior was robbed during one of his bank trips, his son and a friend, Raul Lopez, regularly accompanied him to the bank.
On Friday, December 6, 1991, the trio left the bank with $25,000 in cash. The Cabanases rode together in a Chevrolet Blazer driven by the son; Lopez followed in his Ford pickup truck. As the trio drove alongside the Palmetto Expressway, their vehicles were "boxed in" at an intersection by two Chevrolet Suburbans. Two masked men exited from the front Suburban and began shooting at the Cabanases. When Cabanas Senior returned fire, the assailants returned to their vehicles and fled. Cabanas Junior also saw one masked person exit the rear Suburban.
Following this exchange of gunfire, Lopez was found outside his vehicle with a bullet wound in his chest. He was transported to the hospital, but died shortly thereafter.
The Suburbans driven by the masked men were found abandoned. It was subsequently determined that both vehicles had been stolen. The Suburbans suffered bullet damage, including thirteen bullet holes in one vehicle. The Cabanases' Blazer was also riddled with ten bullet holes.
San Martin's confession and a subsequent statement, in which he told the police where he had disposed of the weapons used in the incident, were admitted at trial. San Martin refused to allow either statement to be recorded stenographically, but did sign a waiver of his Miranda[1] rights and orally confessed to the crime. San Martin admitted his involvement in the incident and recounted the details of the plan and how it was executed. He explained that Fernando Fernandez had told him and Franqui about Cabanas's check cashing business several months before this incident and that they had planned the robbery by watching Cabanas to learn his routine. He also explained how they used the stolen Suburbans to "box in" the victims at an intersection: San Martin and Abreu drove in front of the Cabanases' Blazer and Franqui pulled alongside the Blazer in the second Suburban so that the Cabanases could not escape. He also recounted that a brown pickup driven by Cabanas's "bodyguard" drove up behind the Blazer. San Martin stated that he exited the passenger side of the first Suburban armed with a 9 mm semiautomatic pistol and that Abreu exited the driver side armed with a "small machine gun." San Martin admitted that he initiated the robbery attempt by telling the occupants of the Blazer not to move and that he shot at the Blazer when the driver fired at them. However, he denied firing at Lopez's pickup. San Martin also detailed Franqui's role in the planning and execution of the crime. He placed Franqui in proximity to Lopez's pickup, but could not tell if Franqui fired his gun during the incident. San Martin initially claimed that he had thrown the weapons used in the incident off a Miami Beach bridge, but in a subsequent statement admitted that he had thrown the weapons into a river near his home and drew a map detailing the location. Two weapons, a 9 mm semiautomatic pistol and a .357 revolver, were later recovered from that location by a police diver. San Martin did not testify at trial, but his oral confession and subsequent statement about the guns were admitted into evidence.
Franqui's formal written confession was also admitted at trial, over San Martin's objection. Franqui initially denied any knowledge of the Lopez shooting, but confessed *1342 when confronted with photographs of the bank and the Suburbans. Franqui recounted the same details of the planning and execution of the crime that San Martin had detailed. Franqui admitted that he had a .357 or .38 revolver. He also stated that San Martin's 9mm semiautomatic jammed at times and that Abreu carried a Tech-9 9 mm semiautomatic which resembles a small machine gun. Franqui claimed that he returned fire in Lopez's direction after Lopez opened fire on him.
A police firearms expert testified that the bullet recovered from Lopez's body was consistent with the .357 revolver used by Franqui during the attempted robbery. The expert also stated that a bullet recovered from the passenger mirror of one of the Suburbans and a bullet found in the hood of the Blazer were definitely fired from the same gun as the Lopez bullet. However, due to the rust on the .357 recovered from the river, the expert could not rule out the possibility that all three bullets had been fired from another .357 revolver.
The jury found San Martin guilty as charged on all counts and recommended by a nine-to-three vote that he be sentenced to death for the first-degree murder conviction. The trial court found that three aggravating circumstances were proven beyond a reasonable doubt: (1) prior violent felony convictions; (2) the murder was committed during the course of an attempted robbery and for pecuniary gain (merged into one aggravating circumstance); and (3) the murder was committed in a cold, calculated, and premeditated manner (CCP). See § 921.141(5)(b), (d), (f), (i), Fla. Stat. (1995). The court found no statutory mitigating circumstances and only one nonstatutory mitigating circumstance: that San Martin was a good son, grandson, and brother who found religion in jail and displayed a good attitude in confinement. The court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced San Martin to death on the first-degree murder charge. The court also imposed the following sentences for the other convictions: life imprisonment on the two attempted murder charges; fifteen years imprisonment on the attempted robbery and unlawful firearm possession charges; and five years imprisonment on the two grand theft charges. All sentences were ordered to run consecutively.
San Martin raises seventeen claims on appeal. He asserts the following as error: (1) the jury was death-qualified and San Martin was denied individual sequestered voir dire of the prospective jurors; (2) the trial court denied San Martin's motion to sever his trial from codefendant Franqui which violated his Confrontation Clause rights because Franqui's confession incriminating San Martin was admitted into evidence at their joint trial; (3) the court admitted into evidence San Martin's and Franqui's statements to the police; (4) and (5) the evidence was insufficient to sustain the conviction for premeditated murder; (6) the prosecutor commented on San Martin's right to remain silent; (7) the general verdict form did not specify whether the jury found San Martin guilty of premeditated or felony murder; (8) San Martin was denied the use of experts at trial; (9) the State's mental health expert misstated the law relating to mitigating circumstances and the trial court erred in subsequently rejecting San Martin's claimed mitigating circumstances; (10) the trial court erred by instructing the jury on the CCP aggravating circumstance and by finding that CCP was applicable; (11) the trial court prohibited either argument or instruction to the jury regarding the potential imposition of consecutive sentences; (12) defense counsel was prohibited from fully cross-examining State witnesses who testified about San Martin's past convictions; (13) the trial court failed to instruct the jury as to specific non-statutory mitigating circumstances that San Martin claimed were applicable; (14) the death penalty statute and instructions unconstitutionally shift the burden to the defendant to prove that a death sentence is not warranted; (15) the death penalty statute is unconstitutional; (16) numerous instances of prosecutorial misconduct rendered the trial unfair; and (17) the trial court made reference to a separate, and at the time untried, charge against San Martin for the murder of a police officer.
As his first issue, San Martin questions the jury selection process in two respects. *1343 First, he contends that Florida's jury selection process results in a jury that is death-qualified because prospective jurors who would not impose the death penalty are excused for cause and prospective jurors who are opposed to the death penalty but would impose it under the appropriate circumstances are removed through peremptory challenges. Initially, we note that this issue was not properly preserved as San Martin did not object to any of the State's peremptory challenges on this basis. Furthermore, we find no merit to this claim as "the Constitution does not prohibit the States from `death qualifying' juries in capital cases." Lockhart v. McCree, 476 U.S. 162, 173, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986). Indeed, any group "defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case[] may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement." Id. at 176-77, 106 S.Ct. at 1766-67. As the Supreme Court further noted in Lockhart, not all individuals who oppose the death penalty are subject to removal for cause in capital cases; "only those who cannot and will not conscientiously obey the law with respect to one of the issues in a capital case." Id. at 176, 106 S.Ct. at 1766. Moreover, the State may properly exercise its peremptory challenges to strike prospective jurors who are opposed to the death penalty, but not subject to challenge for cause. Under Florida law, a party's use of peremptory challenges is limited only by the rule that the challenges may not be used to exclude members of a "distinctive group." See State v. Neil, 457 So.2d 481 (Fla.1984) (holding that race-based peremptory challenges violate the defendant's right to an impartial jury); State v. Alen, 616 So.2d 452 (Fla.1993) (same as to ethnicity); Abshire v. State, 642 So.2d 542 (Fla.1994) (same as to gender). Both parties have the right to peremptorily strike "persons thought to be inclined against their interests." Holland v. Illinois, 493 U.S. 474, 480, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990). Thus, we find no constitutional infirmity in Florida's jury selection process in general.
Moreover, the facts of the instant case do not reveal a specific infirmity in the selection process. Of the prospective jurors who expressed some form of reservation regarding the death penalty, one ultimately served on the jury and six were struck at the behest or acquiescence of San Martin.[2] Two others were removed by the State through peremptory challenges and four were challenged for cause over defense objection. Our review of the record reveals no error in granting these challenges. The jurors who were excused for cause had expressed their personal opposition to the death penalty and had, at best, responded equivocally when asked whether they could put aside their personal feelings and follow the law. As to the two peremptory challenges, the court conducted a Neil inquiry in each instance when the defense questioned whether the challenges were being used in a racially discriminatory manner. The State presented a race-neutral basis for the challenges of each of the prospective jurors. Thus, we find no merit to this issue.
As a second part of this jury selection issue, San Martin argues that he was denied a fair trial by the court's refusal to allow individual sequestered voir dire of the prospective jurors so as to prevent "tainting of the jury on death qualification issues." Initially, we note that this issue has not been preserved for review. When voir dire originally commenced in July 1993, the court denied the codefendants' motion for individual sequestered voir dire. However, the trial was continued and the venire discharged the next day when San Martin's attorney was called away for a family emergency. When trial commenced again in mid-September, there was no request for individual sequestered voir dire. However, even if the issue were properly before us, we would find no error. The determination of whether to grant individual sequestered voir dire rests in the trial court's sound discretion. Randolph v. State, 562 So.2d 331, 337 (Fla.1990); *1344 Davis v. State, 461 So.2d 67, 69 (Fla.1984). Because the purpose of conducting voir dire is to secure an impartial jury, the trial court's denial of individual voir dire will only be reversed where a defendant demonstrates the partiality of the jury or an abuse of discretion by the trial court. Davis, 461 So.2d at 70. In the instant case, San Martin has demonstrated neither and we find no merit to his claim.
In issue 2, San Martin claims that the trial court erred by denying his motion for severance because the admission of Franqui's confession incriminating San Martin during their joint trial violated San Martin's Confrontation Clause rights. Franqui also raised this issue in his direct appeal and we determined that the admission of San Martin's initial confession was error because "it contained statements which were incriminating as to Franqui." Franqui v. State, 699 So.2d 1312, 1320 (Fla.1997). In the instant case, Franqui's confession did implicate San Martin in the planning and execution of this crime. Thus, as we concluded in Franqui, that portion of Franqui's confession which implicated San Martin should not have been introduced into evidence. However, for the same reasons expressed in Franqui we conclude that the error was harmless. See id. at 1321.
Franqui's confession mirrors San Martin's own confession in almost every aspect. San Martin's confession is powerful evidence of his guilt: he admitted his involvement in planning and carrying out the robbery; he admitted firing at the robbery victims; and he told the police where to recover the weapons that he said were used during the crime. The other evidence, including eyewitness testimony and physical evidence, also corroborates San Martin's confession. While the evidence does not support a finding that San Martin fired the fatal shots, it does support a conclusion that he was an active participant in the robbery plan, including firing at the robbery victims. In this case where the jury specifically found San Martin guilty of first degree murder either by premeditated design or in the course of a felony, and the evidence supports both theories, we conclude beyond a reasonable doubt that the Confrontation Clause violation in admitting Franqui's statements was harmless beyond a reasonable doubt as it relates to San Martin's conviction of first-degree murder. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
San Martin also argues that the trial court erred in denying the codefendants' motions to suppress their statements to the police (issue 3). Specifically, he argues that the statements were not voluntary based upon the codefendants' low intelligence and the circumstances under which the statements were given. San Martin was in custody at the Dade County Interim Detention Center on another matter when he voluntarily agreed to accompany two officers to the Metro-Dade Police Department. San Martin was informed in Spanish about his Miranda rights, voluntarily waived those rights, and signed the waiver form. He agreed to answer questions and detailed his involvement in the attempted robbery of the Cabanases which resulted in Lopez's murder. However, San Martin refused to have his statement stenographically recorded. San Martin filed a pretrial motion to suppress his statements,[3] arguing that they were not voluntary because of the circumstances under which they were given, including that: he was in custody on a separate matter and was represented by counsel in that case; the interrogation lasted for ten hours; no notice was given to his counsel and counsel was absent during the interrogation; the police officers confronted him and told him that he had already been implicated by his codefendants; and there was no memorialization of his statement. During the evidentiary hearing on the motions to suppress, the court heard testimony from eight police officers and the codefendants. In denying San Martin's motion, the court determined that San Martin freely and voluntarily waived his rights and fully cooperated in the interview *1345 process. The court also determined that San Martin was not questioned during substantial periods of the time he was at the police station. The court rejected as not credible San Martin's testimony that he had invoked his Miranda right to counsel during interrogation and that he could "feel" beatings being administered to his friends in adjoining rooms. The court further determined that San Martin had never clearly invoked his Sixth Amendment right to counsel in the original matter for which he was under arrest, although an invocation of that right to counsel would not have changed the court's finding as to the instant crime. See McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (explaining that Sixth Amendment right to counsel is offense-specific and that invoking that right does not constitute an invocation of Fifth Amendment right to counsel protected by Miranda).
Initially, we note that San Martin's intelligence level was never argued to the trial court as a basis for suppressing the statements. Thus, that issue is not available for appellate review. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.").
A trial court's ruling on a motion to suppress comes to us clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling. Owen v. State, 560 So.2d 207, 211 (Fla.1990), receded from on other grounds, State v. Owen, 696 So.2d 715 (Fla.1997). Our review of the testimony and evidence presented at the evidentiary hearing in the instant case supports the trial court's finding that the statements were knowingly and voluntarily made. Thus, the court's ruling on the motion to suppress must be upheld. Rhodes v. State, 638 So.2d 920, 925 (Fla.1994) (ruling on motion to suppress is presumed correct and will be upheld if supported by the record).
San Martin also argues that Franqui's confession and statements to the police should have been suppressed. We do not find that San Martin has standing to question the voluntariness of Franqui's statements. See McKenney v. State, 388 So.2d 1232, 1234 (Fla.1980) (finding that defendant did not have standing to object to violations of witness's constitutional rights). However, even if San Martin could properly raise this issue, we would find no merit to his claim as the record supports the trial court's denial of Franqui's motion to suppress. See also Franqui, 699 So.2d at 1321 n. 3 (stating that there was no competent evidence in the record to support argument that Franqui's confession was not reliable).
In issues 4 and 5, San Martin argues that the evidence was insufficient to sustain his conviction for premeditated first-degree murder. We find no merit to these issues. Both of the Cabanases testified that the masked men initiated the shooting immediately upon exiting the first Suburban. Cabanas Senior also testified that these assailants shot into the passenger compartment of the Blazer, with one shot only missing his head because he ducked quickly. The physical evidence confirmed extensive bullet damage to the victims' vehicles. The Cabanases' Blazer sustained ten bullet holes, including holes in the windshield and the passenger seat. Lopez's vehicle revealed evidence that one bullet had passed through the windshield over the steering wheel, through the back window, and landed in the bed of the truck; another bullet ricocheted off the windshield. The firearms evidence revealed that at least four shells were ejected at the murder scene from the gun that San Martin admits using; four other spent casings from the same gun were found near the Suburban that San Martin abandoned at another location. This evidence is sufficient to support San Martin's conviction for premeditated murder. Furthermore, the jury returned a general verdict on the first-degree murder charge and the circumstances of this case clearly support a conviction under the felony murder theory: San Martin was a principal and a direct, active participant in the attempted robbery which resulted in Lopez's murder and his actions clearly indicate a reckless indifference *1346 to human life. See Tison v. Arizona, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987) (holding that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy culpability requirement for imposing death sentence under felony murder theory). Thus, we find no error as to San Martin's conviction for first-degree murder.
In his next issue, San Martin alleges that the prosecutor elicited testimony that amounted to an impermissible comment on his Fifth Amendment right to remain silent (issue 6). On direct examination by the prosecutor, State witness Detective Michael Santos testified as to the substance of San Martin's statement to the police and the circumstances under which the statement was given. Santos testified that he advised San Martin of his Miranda rights in Spanish and that San Martin signed a "waiver of rights" form. Santos further testified that San Martin gave an oral statement recounting his involvement in the robbery and shooting, but refused to give a stenographically recorded statement. Defense counsel objected that this testimony constituted an improper comment on San Martin's constitutional right to remain silent. The trial court overruled the objection, finding that under the circumstances, San Martin's refusal to give a formal recorded statement was not an exercise of his right to remain silent and thus Santos' testimony was admissible.
We agree with the trial court. As the First District Court of Appeal explained in McCoy v. State, 429 So.2d 1256, 1257 (Fla. 1st DCA 1983),
[t]he accuracy and integrity of oral incriminating statements are frequent targets of defense counsel who often suggest the unfairness of the use of oral statements of an accused who has not been afforded the opportunity to put his statement in writing. It is only reasonable that the State be permitted to elicit the fact that the accused was given the opportunity and declined.
In the instant case, San Martin freely and voluntarily discussed the events surrounding the robbery and homicide. He did not refuse further questioning, but simply refused to have his statement recorded stenographically. San Martin did not exercise his right to remain silent and in fact gave further statements to the police on subsequent dates. Thus, Santos' testimony was properly admitted.
In issue 7, San Martin contends that the use of a single verdict form that does not specify whether the jury found him guilty of premeditated or felony first-degree murder violated his constitutional rights to due process and a fair trial and subjected him to cruel and unusual punishment. This Court has repeatedly rejected this contention. See, e.g., Brown v. State, 473 So.2d 1260, 1265 (Fla.1985) ("Neither constitutional principles nor rules of law or procedure require such special verdicts in capital cases."). Moreover, the evidence in this case supports San Martin's conviction under either theory: San Martin was a participant in a carefully planned robbery scheme, which included a plan to shoot and kill Lopez, the victim here.
In issue 8, San Martin contends that the trial court denied him the use of expert witnesses because: (1) the court refused to authorize his court-appointed defense counsel to engage the services of a jury selection expert; and (2) the court denied defense counsel's request for funds to travel to Denmark to take the deposition of Dr. Hans Hougen, the visiting medical examiner who performed the Lopez autopsy.
As to the first part of this claim, San Martin contends that he was denied equal protection because a jury selection expert would have been available had he been represented by the Public Defender's Office. This equal protection claim was never raised below and thus is not cognizable on appeal. See Steinhorst. At the pretrial hearing on this request, defense counsel argued that due process required the appointment of a jury selection expert because the State was seeking the death penalty. In denying the request, the court stated that San Martin's counsel were "experienced trial lawyers" who were "very capable" of making jury selection decisions on their own.
*1347 A trial court's refusal to provide funds for the appointment of experts for an indigent defendant will not be disturbed unless there has been an abuse of discretion. Martin v. State, 455 So.2d 370, 372 (Fla. 1984). In evaluating whether there was an abuse of discretion, courts have applied a two-part test: (1) whether the defendant made a particularized showing of need; and (2) whether the defendant was prejudiced by the court's denial of the motion requesting the expert assistance. Dingle v. State, 654 So.2d 164, 166 (Fla. 3d DCA 1995). In the instant case, we agree with the trial court that jury selection is a legal function that should be within the competence of experienced trial lawyers. Moreover, defense counsel made no particularized showing of need; he merely stated that due process required appointment of such an expert where the State sought the death penalty. Thus, we find no abuse of discretion by the trial court in denying this request.
As to the second part of this claim, San Martin contends that his counsel was hampered in defense efforts because Dr. Hougen's autopsy diagram of Lopez's body showed an exit wound while hospital medical records showed that a single bullet penetrated the body and was removed at the hospital. The State introduced Dr. Hougen's diagram and exam results through the testimony of another medical examiner who did not conduct the autopsy or examine the body.[4] We find that this issue was waived below. At a pretrial hearing, defense counsel agreed to depose Dr. Hougen telephonically and seek further relief from the court if necessary. After Dr. Hougen was deposed by telephone, defense counsel never renewed his request for funds to travel to Denmark.
Next, San Martin contends that the court erred in two respects as to mitigating circumstances: (1) in permitting the State's rebuttal witness, psychiatrist Dr. Charles Mutter, to give his opinion that no statutory or nonstatutory mental health mitigating circumstances were applicable to San Martin; and (2) in rejecting the mitigating circumstances claimed by San Martin. During cross-examination of Dr. Mutter, San Martin's counsel asked, over the State's objection, whether borderline intelligence would be a mitigating circumstance. Dr. Mutter responded that he would consider borderline intelligence to be a mitigating circumstance only where "it rises to the level where he doesn't really know what he's doing or knowing what he's doing is wrong because his intellectual capacity is impaired." After this statement was elicited by defense counsel, the State objected again and requested a cautionary instruction to inform the jury that this was not the law as to mitigating circumstances. The court instructed the jury that they should resolve any conflict regarding the law in favor of what the court instructed them was the law.
Under these circumstances where defense counsel specifically asked Dr. Mutter his opinion on this issue, San Martin cannot raise the issue as error. A party may not invite error and then be heard to complain of that error on appeal. Terry v. State, 668 So.2d 954, 962 (Fla.1996); Pope v. State, 441 So.2d 1073, 1076 (Fla.1983).
We find no error as to the second part of this issue as well. San Martin contends that the court improperly rejected the following mitigators: the two statutory mental mitigators (committed while under the influence of extreme mental or emotional disturbance; and substantial impairment of the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law); the statutory mitigator of acting under the substantial domination of another person; and the nonstatutory mitigators of borderline intelligence, organic brain damage, and mental problems not rising to the level of the statutory mitigating factors.
In rejecting the extreme mental or emotional disturbance mitigator, the sentencing *1348 order noted that San Martin's second mental health expert, Dr. Jorge Herrera, concluded that the defendant did not suffer from such disturbance. The court also noted that Dr. Dorita Marina's conclusions to the contrary were refuted by the testimony of San Martin's family. This testimony revealed that San Martin came from a "close and loving family," that he was "a good and conscientious son and brother who always cared for his family," that "he was able to hold down a good job for several years," and that, although San Martin's father drank too much, he never mistreated San Martin as San Martin had reported to Dr. Marina. The sentencing order also detailed the thorough planning and calculation involved in the instant crime which "belie Dr. Marina's suggestion that the defendant acted while under extreme mental or emotional disturbance."
The court similarly rejected the mitigating circumstance of substantially impaired capacity. The sentencing order again notes that San Martin's second expert, Dr. Marina, did not opine that this mitigating factor applied and that the State's expert disagreed that this mitigator existed. The order cites the defendant's actions in planning and executing this crime as evidence that he "knew exactly what he was doing": careful planning of the robbery by stalking the Cabanases; wearing a stocking mask and gloves to the crime to conceal his identity; and stealing two vehicles in which to commit the act and leaving a getaway vehicle in a strategic location to facilitate an escape. The sentencing order also rejected the substantial domination mitigator because "[t]he evidence clearly establishes that [San Martin] was an integral part of the planning and execution of these crimes."
Dr. Marina testified that San Martin is in the borderline range of intelligence (IQ of 77). The sentencing order rejected low intelligence as a mitigating circumstance, citing the following reasons:
The court has considered the results of Dr. Marinas's test as concerns the defendant's IQ. Since it is impossible for the court to verify the accuracy or validity of such a test, the court must consider it in the light of the facts known to the court.
In making this analysis the court is conscious of the fact that although an individual's performance on such a test may be unable to exceed his true abilities it may easily reflect less than his best efforts.
The defense suggests that this court should accept, as a non-statutory mitigating factor the fact that, according to Dr. Marina, Mr. San Martin is in the borderline range of intelligence. Every piece of evidence presented in this trial, penalty phase and sentencing hearings, with the exception of Dr. Marina's testimony, definitely establishes that Mr. San Martin is capable of goal oriented and sophisticated conduct. The crimes he has committed, as described above, reflect a pattern of premeditation, calculation and shrewd planning that are not consistent with someone in the low range of intelligence. Mr. San Martin's "good employment background" (one of the asserted non-statutory mitigating circumstances) as established by the defendant's family, shows that he was not only a good employee but a thoughtful provider, albeit not the sole or primary provider, for his family. Additionally, the defendant was the one his brothers and sisters came to for advice. This would hardly be likely if he was as unintelligent as Dr. Marina would have us believe. The court rejects the existence of this nonstatutory mitigating circumstance.
Although the court accepted the fact that San Martin has a lesion in the left temporal lobe of his brain, the court rejected organic brain damage as a mitigating circumstance because it "did not affect the defendant's violent behavior in school several years before the injury which supposedly caused the lesion and it did not affect [him] during the eight years prior to [the date] when his violent crime spree began."
A trial court has broad discretion in determining the applicability of mitigating circumstances urged. Kight v. State, 512 So.2d 922, 933 (Fla.1987). It is clear from the sentencing order that the judge considered all the evidence presented in both the guilt and penalty phases of the trial and all the mitigating circumstances urged by the defense. There is competent substantial evidence *1349 to support the trial court's rejection of these mitigating circumstances. Id. Thus, we find no error in the trial court's failure to find these mitigating factors applicable.
In issue 10, San Martin argues that the court erred in instructing the jury on the CCP aggravating circumstance and in finding that CCP was applicable. We rejected this same argument when raised by codefendant Franqui. Franqui, 699 So.2d at 1324. As we found in Franqui, the "evidence supports the trial court's finding that not only was the robbery carefully planned in advance, but there was also a plan for Franqui to shoot and kill the bodyguard, the victim here." Id. The fact that the plan called for Franqui to shoot the victim does not negate the CCP aggravator as to San Martin. Abreu's testimony reveals that in a cold, calculated, and premeditated manner the trio planned Lopez's murder in order to facilitate the robbery. Abreu also testified that the plan called for San Martin and him to get out of the front Suburban, go to the Blazer where "the men behind us were with the money," and "shoot." He further testified that he and San Martin did in fact exit their vehicle and "started shooting." The other evidence also supports CCP: the Cabanases testified that the shooting started immediately after the codefendants blocked the victims' vehicles and before the victims ever fired any shots; forensic results showed that the victim Lopez's weapon was fully loaded but had not been fired. Thus, we conclude that the trial court did not err in instructing the jury as to the CCP aggravator or in finding that the aggravator was applicable. See Franqui, 699 So.2d at 1324.
San Martin's next issue is also identical to an issue raised in Franqui's direct appeal. San Martin contends that the court erred by prohibiting argument or instruction to the jury on the court's power to impose consecutive sentences (issue 11). As we concluded in Franqui, the trial court did not abuse its discretion in denying either argument or instruction on the possibility of consecutive sentences. Id. at 1326-27. The sole issue before the jury was the proper sentence on the murder charge. Marquard v. State, 641 So.2d 54, 58 (Fla.1994).
In order to prove the aggravating circumstance of prior violent felony convictions, the State introduced evidence of San Martin's two previous convictions (armed robbery and armed kidnapping; and attempted first-degree murder and attempted robbery with a firearm). In issue 12, San Martin contends that he was prohibited from fully cross-examining the witnesses who testified about these crimes and unfairly restricted during closing argument from minimizing the effects of the State's past crimes evidence. As to the first part of this issue, San Martin cites no specific instances where he was limited during cross-examination of the witnesses. In fact, the record shows that defense counsel was not limited in his cross examination of these witnesses and was able to fully explore San Martin's role in these previous crimes. As to the second part of the issue, the court specifically instructed defense counsel that he was free to discuss San Martin's role in the prior crimes and to argue facts that would minimize his participation. Counsel was only restricted from challenging San Martin's conviction for attempted first-degree murder when he in fact had been convicted of that crime. Counsel acceded to this limitation. Thus, we find no merit to either part of this issue.
As his next issue, San Martin argues the that court erred in refusing to instruct the jury as to the specific nonstatutory mitigating circumstances that he claimed to be applicable (issue 13). We find no merit to this claim. San Martin's jury was given the standard instruction on nonstatutory mitigating circumstances, which explains that the jury may consider "any other aspect of the defendant's character or record, [and] any other circumstances of the offense." This standard jury instruction on nonstatutory mitigators is sufficient, and there is no need to give separate instructions on individual items of nonstatutory mitigation. Jones v. State, 612 So.2d 1370, 1375 (Fla.1992). Moreover, the court did instruct the jury that Abreu's life sentence may be a mitigating factor that could be considered and specifically informed defense counsel that they had "free range" to argue all of their proposed *1350 nonstatutory mitigators to the jury, which counsel did during closing argument.
San Martin also contends that the weighing provisions in Florida's death penalty statute[5] and the standard jury instruction thereon unconstitutionally shift the burden to the defendant to prove why he should not be given a death sentence. Initially, we note that because San Martin did not challenge the statute on this basis and raised no objection to the instruction, this issue is not preserved for review. Furthermore, this claim has been rejected by both the United States Supreme Court and this Court. See Walton v. Arizona, 497 U.S. 639, 649-51, 110 S.Ct. 3047, 3054-56, 111 L.Ed.2d 511 (1990); Arango v. State, 411 So.2d 172, 174 (Fla.1982).
San Martin also argues that the death penalty is unconstitutional both facially and as applied. The State argues that this claim is procedurally barred because not raised below. We agree. Furthermore, we have repeatedly rejected this argument. See Fotopoulos v. State, 608 So.2d 784, 794 & n. 7 (Fla.1992) (rejecting a series of constitutional challenges to Florida's death penalty statute).
San Martin alleges that the prosecutor engaged in numerous acts of misconduct that deprived him of a fair trial and due process and subjected him to cruel and unusual punishment (issue 16). Upon reviewing the record, we conclude that most of the alleged improprieties were not preserved for review as defense counsel raised no objections to them. However, even if preserved, the alleged improprieties would not warrant reversal as the prosecutor's statements were not improper when viewed in context.
As his final issue, San Martin argues that the judge unfairly considered a pending indictment for a separate murder. In rejecting San Martin's argument that Abreu's life sentence for the instant crime should be considered a nonstatutory mitigating circumstance, the court discussed Abreu's and San Martin's disparate participation in a robbery that resulted in the death of a Miami police officer. At the time of sentencing those charges were pending against San Martin, but he had not been convicted. The sentencing order provided in pertinent part:
[I]n discussing the suggestion of disparate sentencing, it is impossible to ignore the fact that Abreu pled guilty not only to this indictment but also to the indictment charging the murder of Officer Bauer.
In analyzing the life sentence imposed on Abreu it is important to first acknowledge that Abreu did not have any previous convictions for crimes of violence. More significant however was his peripheral participation in the murder of Officer Bauer. According to the state, during the attempted robbery of the Kislak Bank, Mr. Abreu was a get-away driver stationed several blocks away. The defense has never challenged that factual assertion made by the State during the sentencing hearings. Abreu's relatively small participation in that case must be viewed against the alleged participation of this defendant who, according to the state, was standing next to Officer Bauer when the officer was shot and, as the officer lay dying, stooped to pick up the money that was the object of the robbery.
This court has discussed the pending indictment only for the purpose of honestly addressing the issue of disparate sentencing. Absolutely no consideration is being given to that case in deciding the appropriate sentence herein.
Although the sentencing order disclaims consideration of this pending indictment in determining the appropriate sentence for San Martin, the court clearly factored Abreu's lesser role in that other crime into the sentencing determination here and used it as a basis for distinguishing Abreu's life sentence in this case. We agree with San Martin that the court erred in this regard. However, we find the error to be harmless beyond a reasonable doubt. DiGuilio. Abreu's plea, sentence, and agreement to testify for the State were the products of prosecutorial *1351 discretion and negotiation. See Brown v. State, 473 So.2d 1260, 1268 (Fla.1985) (finding that death sentence was proper even though accomplice received disparate prosecutorial and judicial treatment after pleading to second-degree murder in return for life sentence); see also Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (rejecting argument that prosecutor's authority to decide whether to charge capital offense in the first place and whether to accept plea to lesser offense renders Florida's death penalty scheme unconstitutional). This, combined with the fact that Abreu did not have any previous convictions for crimes of violence, was a valid basis for the court to reject Abreu's life sentence as a mitigating circumstance here.
Just as we concluded in Franqui's direct appeal, we find that the error in admitting Franqui's confession was also harmless in the penalty phase. See Franqui, 699 So.2d at 1328-29. Anything adverse to San Martin that was admitted through Franqui's confession was also contained in San Martin's own confession. In both confessions, San Martin was portrayed as an equal participant in this enterprise with Franqui and Abreu.
Finding no reversible error, we affirm the judgments against San Martin and the sentences imposed, including the sentence of death.
It is so ordered.
OVERTON, SHAW, HARDING and WELLS, JJ., and GRIMES, Senior Justice, concur.
KOGAN, C.J., concurs in part and dissents in part with an opinion in which ANSTEAD, J., concurs.
KOGAN, Chief Justice, concurring in part, dissenting in part.
I agree with the majority that Franqui's confession was erroneously admitted, but I conclude that the error was not harmless. Consequently, I would reverse the conviction and remand for a new trial.
ANSTEAD, J., concurs.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] San Martin struck one of these prospective jurors peremptorily, while his codefendant Franqui challenged another for cause. Four other prospective jurors were struck for cause, either on joint motion or without defense objection.
[3] Franqui also filed a motion to suppress his statements, arguing that his prior invocation of the right to counsel in the original robbery case for which he had been arrested should invalidate his subsequent statements. He also alleged that he was threatened and beaten by the police before he gave his statement.
[4] Because Dr. Hougen had returned to Denmark, the State filed a motion to admit the medical examiner's report into evidence as a public business record and to allow a substitute medical examiner to testify from the autopsy report and render an appropriate opinion. Dr. Valerie Rao, an associate medical examiner with the Dade County Medical Examiner's Office, reviewed the report and the file prepared by Dr. Hougen and testified at trial, over defense objection.
[5] Section 921.141(2), Florida Statutes (1995), provides that the jury shall deliberate and render an advisory sentence based upon several matters, including "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist."