717 So.2d 462 (1998)
Pablo SAN MARTIN, Appellant,
v.
STATE of Florida, Appellee.
No. 84702.
Supreme Court of Florida.
June 11, 1998.
Rehearing Denied September 9, 1998.
*464 Lee Weissenborn, Miami, for Appellant.
Robert A. Butterworth, Attorney General and Randall Sutton, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Pablo San Martin. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. We affirm San Martin's convictions. However, because we find that the trial court's override of the jury's recommendation of a life sentence was improper, we vacate the death sentence and remand for imposition of a life sentence.
The defendant and codefendants Leonardo Franqui, Ricardo Gonzalez, Fernando Fernandez, and Pablo Abreu were charged with first-degree murder of a law enforcement officer, armed robbery with a firearm, aggravated assault, unlawful possession of a firearm while engaged in a criminal offense, grand theft in the third degree, and burglary.[1] San Martin, Franqui, and Gonzalez were jointly tried before a jury in May 1994.
The record reflects that the Kislak National Bank in North Miami, Florida, was robbed by four gunmen on January 3, 1992. The perpetrators drove away in two stolen grey Chevrolet Caprice cars after taking a cash box from one of the drive-in tellers. During the robbery, police officer Steven Bauer was shot and killed. Shortly after the robbery, the vehicles were found abandoned two blocks west of the bank.
Approximately two weeks later, codefendant Gonzalez was stopped by the police after leaving his residence on January 18, 1992. Gonzalez subsequently made unrecorded and recorded confessions in which he told police that Franqui had planned the robbery, recruited the other participants, and chosen the location and date for the crime. Gonzalez also stated that Franqui had procured the two stolen Chevrolets, driven one of the cars, and supplied him with the gun he used during the robbery. Gonzalez further stated that Franqui was the first shooter and had *465 fired at the victim three or four times, while Gonzalez had shot only once. Gonzalez stated that he had shot low and believed that he had only wounded the victim in the leg. During a subsequent re-interview, Gonzalez described how Franqui had shouted at the victim not to move before shooting him.
San Martin and Franqui, who were being held on other charges, were taken from the Dade County Jail to the Homicide Headquarters on January 18, 1992. They were questioned separately about their involvement in the Bauer killing and another attempted robbery in Hialeah where Raul Lopez was killed. After a detective told San Martin that codefendant Fernandez had implicated him in the Bauer case, San Martin conceded that he was involved. San Martin told the detective that Gonzalez, Fernandez, Franqui, and Abreu were also involved, with Abreu driving a getaway car parked several blocks away from the bank. San Martin could not say who carried guns or did the shooting. He admitted that he took the money tray. During a January 21, 1992, interview with a Hialeah detective investigating the Lopez killing, San Martin admitted that he disposed of the weapons in the river off the Dolphin Expressway, where they were later recovered by the police.[2] San Martin also drew a diagram detailing where the weapons could be found, but he refused to sign the drawing.
Franqui initially denied any involvement in the crimes, but confessed after a detective told him that the others were in custody and naming him as a participant. He recounted essentially the same story as the others. He also stated that only he and Gonzalez were armed. He stated that Gonzalez yelled "freeze" to Bauer after they saw his weapon. He denied firing the first shot and admitted firing only one shot.
The codefendants filed pretrial motions to suppress their confessions and to sever their trials. San Martin's motion to sever was based upon the codefendants' statements that incriminated him. San Martin requested either a severance from the other defendants or that their statements be excluded. He also filed a motion to suppress his own confession on the basis that it was obtained in violation of his right to counsel and privilege against self-incrimination, and that it was not freely and voluntarily given. After hearings on the various motions, the court denied all of the codefendants' motions, with the exception of Fernandez's motion to sever his trial. Dual juries were selected, with Jury A hearing Fernandez's case and Jury B rendering a verdict for codefendants San Martin, Franqui, and Gonzalez.
The jury found San Martin guilty of first degree murder of a law enforcement officer, armed robbery, aggravated assault, and both counts of grand theft and burglary. San Martin filed a motion to sever his penalty phase proceedings from those of Franqui and Gonzalez; the court denied the motion.
During the penalty phase, the State presented evidence of San Martin's three previous violent felony convictions (armed kidnapping and armed robbery; aggravated assault and attempted robbery with a firearm; and first-degree murder, attempted first-degree murder, and armed robbery with a firearm). Dr. Antonio Lourenco and Dr. Jorge Herrera, two defense mental health experts who examined San Martin and administered a number of tests, testified that San Martin had a lesion on the left side temporal lobe of his brain and had borderline intelligence. A church deacon testified that San Martin had become a Christian while incarcerated. His family members testified that he was a good son and brother, had been hyperactive as a child, and had been physically abused by his alcoholic father. The jury recommended a life sentence for San Martin.[3]
*466 A sentencing proceeding was held before the court and additional testimony was presented. State expert forensic psychiatrist Dr. Charles Mutter had evaluated San Martin one year before for the Lopez trial and reviewed the defendant's confession in the instant case and the records from the previous case. Dr. Mutter did not dispute the findings that San Martin had a brain lesion or borderline intelligence, but he opined that San Martin's reasoning was not impaired to the point that he did not understand the consequences of his actions. Dr. Mutter also stated that all of the information presented by family members at the previous trial and San Martin's own report was that he was well treated as a child. Dr. Lourenco was called by the defense and disagreed with Dr. Mutter's conclusions.
The judge overrode the jury's recommendation and imposed a death sentence. The court found three aggravating circumstances: (1) previous convictions of violent and/or capital felonies; (2) the murder was committed during the course of a robbery and committed for pecuniary gain (merged into one aggravator); and (3) the murder victim was a law enforcement officer and the murder was committed to avoid arrest (merged into one aggravator). See § 921.141(5)(b), (d), (e), (f), (j), Fla. Stat. (1993). The court gave great weight to these aggravating circumstances. The court found no statutory mitigating circumstances. Of the sixteen nonstatutory mitigating circumstances proffered by the defense, the court found that only two were proven: (1) San Martin had turned to God and changed for the better in jail; and (2) San Martin had little parental guidance. These mitigating circumstances were given little weight. The court also conducted an Enmund-Tison[4] analysis and concluded that San Martin was a major participant in the crime, intended lethal force to be used, and had exhibited a reckless indifference to human life.
San Martin raises fourteen issues on appeal: (1) the denial of his motion for severance based upon the introduction of the confessions of his nontestifying codefendants Franqui and Gonzalez at their joint trial; (2) the failure to suppress defendant's confession and the admission of his codefendants' confessions as evidence against him; (3) the "death-qualification" of the jury compounded by the prosecutor's comments during voir dire and the court's refusal to conduct individual sequestered voir dire of the prospective jurors on the issue of the death penalty; (4) the failure of the verdict form to specify whether the verdict was based on felony or premeditated first-degree murder; (5) the sufficiency of the evidence to support the conviction of premeditated first-degree murder; (6) the admission of testimony by two witnesses as to the victim's last words; (7) the admission of documentary evidence pertaining to the codefendants as direct evidence against San Martin; (8) the presentation of testimony by forensic psychiatrist Dr. Mutter as testimony at the sentencing hearing before the judge; (9) the denial of the defendant's request for medical expert assistance based upon Dr. Mutter's sentencing hearing testimony; (10) the judge's override of the jury's recommendation of a life sentence; (11) the constitutionality of the death penalty statute; (12) the proportionality of the death sentence in this case; (13) the court's consideration of law enforcement officer aggravating factor; and (14) the denial of *467 the defendant's peremptory challenges of jurors Andani and Diaz.

Guilt Phase
San Martin raises two issues relating to jury selection (issues 3 and 14). First, he contends that the voir dire procedure resulted in a jury that denied him a fair trial. Second, San Martin claims that the trial court improperly denied his peremptory challenges of two jurors.
Initially, we note that "the Constitution does not prohibit the States from `death qualifying' juries in capital cases." Lockhart v. McCree, 476 U.S. 162, 173, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Indeed, any group "defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case[] may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement." Id. at 176-77, 106 S.Ct. 1758. Based upon these principles, we have found that there is "no constitutional infirmity in Florida's jury selection process in general." San Martin v. State, 705 So.2d 1337, 1343 (Fla.1997).
In issue 3, San Martin claims that three errors occurred during voir dire questioning in his case: the prosecutor proselytized prospective jurors as to the State's view of the case; the trial court denied the defendant's request for individual or sequestered voir dire; and prospective jurors who were opposed to the death penalty were removed from the panel either by peremptory or cause challenges. San Martin alleges that the combination of these three factors denied him due process and a fair trial and resulted in the infliction of cruel or unusual punishment. We find that San Martin's claims of specific infirmities in the jury selection process either have not been preserved for review or are without merit.
San Martin claims that the prosecutor improperly used voir dire questioning to predispose the members of the jury panel to find the codefendants guilty of first-degree murder and to sentence them to death. In order to preserve a claim of prosecutorial misconduct for review, the defense must make a specific contemporaneous objection at trial. Ferguson v. State, 417 So.2d 639, 641 (Fla. 1982). No such objection was interposed by the defense here. Moreover, even if the issue had been preserved for appeal we would find no merit to this claim. Our review of the record reveals no prosecutorial overreaching during voir dire.
San Martin also claims that the court's refusal to conduct individual or sequestered voir dire of the prospective jurors on the issue of the death penalty exacerbated problems with the jury selection process. The determination of whether to grant individual or sequestered voir dire rests in the trial court's sound discretion. Randolph v. State, 562 So.2d 331, 337 (Fla.1990); Davis v. State, 461 So.2d 67, 69 (Fla.1984). The purpose of conducting voir dire is to secure an impartial jury, and a trial court's denial of individual voir dire will only be reversed where a defendant demonstrates the partiality of the jury or an abuse of discretion by the trial court. Davis, 461 So.2d at 69-70. San Martin has not demonstrated that the jury in his case could not "conscientiously apply the law and find the facts." Wainwright v. Witt, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (explaining definition of impartial jury). Nor has he demonstrated an abuse of discretion by the judge. Thus, we find no merit to this claim.
Finally, San Martin claims that prospective jurors who did not believe in the death penalty were improperly eliminated by peremptory or cause challenges. As the United States Supreme Court explained in Lockhart, individuals "who cannot and will not conscientiously obey the law with respect to one of the issues in a capital case" are subject to removal for cause. Lockhart, 476 U.S. at 176, 106 S.Ct. 1758. In addition, "the State may properly exercise its peremptory challenges to strike prospective jurors who are opposed to the death penalty, but not subject to challenge for cause ... [because] [b]oth parties have the right to peremptorily strike `persons thought to be inclined against their interests.'" San Martin, 705 So.2d at 1343 (quoting Holland v. Illinois, 493 U.S. 474, 480, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990)). In order to state a claim regarding the striking of a juror for his or her views on *468 the death penalty, San Martin would have to identify a specific instance where a prospective juror was removed for cause even though that juror's views on capital punishment would not "prevent or substantially impair the performance of [the juror's] duties as a juror in accordance with [the juror's] instructions and [the juror's] oath." Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. 844 (quoting Adams v. Texas, 448 U.S. 38, 44, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)) (clarifying decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). Thus, San Martin has not stated a proper basis for relief. Moreover, in order to raise this issue on appeal, the defendant must preserve it below by making a contemporaneous objection to the trial court's dismissal for cause. Peterka v. State, 640 So.2d 59, 65 (Fla.1994); Cannady v. State, 620 So.2d 165, 169 (Fla.1993).
Turning to San Martin's second jury selection issue, we note that we previously addressed the identical issue in the direct appeals of codefendants Franqui and Gonzalez and found the issue to be meritless. We concluded that the trial court's determination to strike the challenges of prospective jurors Diaz and Andani was not clearly erroneous. Gonzalez v. State, 700 So.2d 1217, 1218 (Fla. 1997); Franqui v. State, 699 So.2d 1332, 1335 & n. 6 (Fla.1997). Thus, we find no merit to this claim.
Issue 1 and part of issue 2 involve the admission of the codefendants' confessions against San Martin in their joint trial and the denial of San Martin's motion to sever his trial from that of his codefendants. Franqui and Gonzalez also raised this issue in their direct appeals. See Gonzalez, 700 So.2d at 1218-19; Franqui, 699 So.2d at 1335-36. As we previously determined in Gonzalez and Franqui, Gonzalez's and Franqui's confessions interlocked with San Martin's confession in many respects and were substantially incriminating to San Martin. "Moreover, we cannot say that the totality of the circumstances under which Franqui and [Gonzalez] made their confessions demonstrated the particularized guarantee of trustworthiness sufficient to overcome the presumption of unreliability that attaches to accomplices' hearsay confessions which implicate the defendant." Gonzalez, 700 So.2d at 1219; accord Franqui, 699 So.2d at 1335-36.
Thus, the admission of Gonzalez's and Franqui's confessions was error. We conclude, however, that the error was harmless beyond a reasonable doubt. While the codefendants' confessions implicated San Martin as a participant in the robbery, San Martin confessed his participation in great detail. Specifically, San Martin confessed that he helped steal the cars that were used during the robbery, drove one of the stolen cars during the robbery, and took the money tray from the teller. San Martin also admitted being with Franqui and Gonzalez during the robbery, and an eyewitness identified Franqui as the driver of one of the stolen cars leaving the scene of the crime. Furthermore, Franqui's fingerprints were found on one of the stolen vehicles used to commit the crime. San Martin also directed the police to the weapons that were used in the robbery. Thus, we conclude that there is no reasonable possibility that the erroneous admission of Franqui's and Gonzalez's confessions contributed to San Martin's conviction for felony murder. State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986).
In both Gonzalez and Franqui, we determined that the codefendants' confessions could have resulted in prejudice during the penalty phase deliberations and required reversal of their death sentences. Gonzalez, 700 So.2d at 1217; Franqui, 699 So.2d at 1336. We find that the improperly admitted confessions resulted in no such prejudice to San Martin. Neither confession portrayed San Martin as a shooter. In fact the codefendant confessions were consistent with San Martin's own confession that he did not carry a weapon. Moreover, any prejudice that could have occurred to San Martin during the penalty phase would be rendered moot by our reversal of the death sentence based upon the improper jury override, discussed below.
San Martin also argues in issue 2 that the trial court erred in denying his motion to suppress his January 18 and January 21 statements to the police. The trial court determined that during both interviews San *469 Martin freely and voluntarily waived his rights and fully cooperated in the interview process.[5] As to the January 18 interview where San Martin confessed his involvement in both the Bauer and Lopez killings, the court found that San Martin was read his Miranda[6] rights in Spanish, acknowledged that he understood them, and agreed to speak to the detectives without a lawyer being present. As to the January 21 interview where San Martin revealed the location of the weapons, the court found that San Martin was again advised of his rights and verbally waived those rights, although he refused to execute a written waiver.
A trial court's ruling on a motion to suppress comes to this Court clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling. San Martin, 705 So.2d at 1345; Owen v. State, 560 So.2d 207, 211 (Fla.1990), receded from on other grounds, State v. Owen, 696 So.2d 715 (Fla.1997). Based upon our review of the testimony and evidence presented at the evidentiary hearing in the Lopez case[7] and the additional testimony taken in this case,[8] we find that the record supports the trial court's conclusion that the statements were knowingly and voluntarily made and that San Martin's Fifth and Sixth Amendment rights to counsel were not violated. Thus, the court's ruling on the motion to suppress must be upheld. Rhodes v. State, 638 So.2d 920, 925-26 (Fla.1994) (stating that ruling on motion to suppress is presumed correct and will be upheld if supported by the record).
In issue 4, San Martin contends that the use of a single verdict form that did not specify whether the jury found him guilty of premeditated or felony first-degree murder violated his constitutional rights to due process and a fair trial and subjected him to cruel and unusual punishment. This Court has repeatedly rejected this contention. See, e.g., Brown v. State, 473 So.2d 1260, 1265 (Fla.1985) ("Neither constitutional principles nor rules of law or procedure require such special verdicts in capital cases.").
San Martin also contends that the evidence was insufficient to prove premeditated first-degree murder and thus his conviction must be reversed. We agree with San Martin that the evidence in this case does not support premeditation, but do not find that reversal is warranted on this basis. While it may have been error to instruct the jury on both premeditated and felony murder, see Mungin v. State, 689 So.2d 1026, 1029 (Fla.1995), any error in this regard was clearly harmless. The evidence supported conviction for felony murder and the jury properly convicted San Martin of first-degree murder on this theory. In his statement to the police, San Martin admitted his involvement in the robbery of the bank and described the incident in great detail. San Martin admitted that he and the codefendants checked out the bank before the robbery; that he helped steal the vehicles used during the robbery; that he drove one of the *470 vehicles; that he took the cash box from the teller; and that he received $3000 from the robbery. He also admitted that during the robbery he heard gunshots and saw Officer Bauer on the ground. These circumstances clearly support San Martin's conviction for first-degree murder under the felony murder theory and reversal is not warranted.
While a general guilty verdict must be set aside where the conviction may have rested on an unconstitutional ground[9] or a legally inadequate theory,[10] reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient. Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). The Supreme Court explained this distinction in Griffin as follows:
Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law  whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence, see Duncan v. Louisiana, 391 U.S. 145, 157 [88 S.Ct. 1444, 20 L.Ed.2d 491] (1968). As the Seventh Circuit has put it:
"It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance  remote, it seems to us  that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." United States v. Townsend, 924 F.2d 1385, 1414 ([7th Cir.] 1991).
Griffin, 502 U.S. at 59-60, 112 S.Ct. 466; see also Mungin v. State, 689 So.2d at 1030.
In issue 6, San Martin claims that the court erred when it permitted the two bank tellers to testify as to Officer Bauer's last words. Defense counsel filed a motion in limine to exclude any statements made by Bauer after he was shot, arguing that the statements were hearsay and not relevant to any issue in the case and that any possible probative value was outweighed by the prejudicial effect of the statements. The trial court denied the motion in limine, finding that Bauer's statements were relevant to the issue of whether Bauer was acting as a law enforcement officer or as a security guard at the time of the robbery.
Bank teller LaSonya Hadley testified that Bauer told her he had been shot, asked if she was all right, and told her not to worry because he was just shot in his leg. Teller Michelle Chin Watson testified that Bauer said, "Oh, God," asked if the two tellers were okay, and told them not to worry about him. Defense counsel renewed his objection when Hadley testified but did not object to Watson's testimony. Thus, any objection to Watson's testimony was not preserved for appeal. See Maharaj v. State, 597 So.2d 786, 790 (Fla.1992) (stating that admission of certain newspaper articles at trial was not preserved for appellate review where court denied defendant's pretrial motion in limine to exclude the articles and defendant failed to object when the articles were offered at trial).
Moreover, we find no error in the admission of Bauer's statements through the tellers' testimony. A trial court has wide discretion in areas concerning the admission *471 of evidence, and, unless an abuse of discretion can be shown, its rulings will not be disturbed. Welty v. State, 402 So.2d 1159, 1162-63 (Fla.1981). We find no abuse of discretion here as Bauer's status at the time of the robbery was pertinent both to the penalty that could be imposed[11] and, ultimately, to the applicability of the law enforcement officer aggravating factor.[12]
San Martin also contends that the court erred in admitting as evidence against him certain documentary evidence pertaining to his codefendants Franqui and Gonzalez. San Martin cites to sketches not made by him, Miranda sheets not pertinent to him, fingerprint cards not involving his fingerprints, and "an array of other evidence not applicable to him." San Martin states that his counsel "kept a drum beat of objections" to the admission of such documentary items. He argues that the items constituted improper hearsay and should not have been considered in evidence against him.
San Martin has not stated with specificity what constitutes the "array" of documentary evidence nor has he identified the specific sketches that he claims were improperly admitted. Thus, we address the admission of only those items clearly identified in his brief: Miranda sheets pertaining to Franqui and Gonzalez and fingerprint cards of Franqui and Gonzalez. San Martin's counsel objected to the admission of these items on the basis of hearsay and relevancy and asked that the jury be given a cautionary instruction. While these items were clearly admissible to prove the voluntariness of Franqui's and Gonzalez's confessions and to prove identity, we find the court erred in denying San Martin's request for an instruction as to the purposes for which the evidence was being admitted. However, we find this error to be harmless because there is no reasonable possibility that the jury's consideration of these documentary items contributed to San Martin's conviction for felony murder. DiGuilio.
Finding no reversible error in the guilt phase of San Martin's trial, we affirm his convictions.

Penalty Phase
Turning to the penalty phase, we find issue 10 to be dispositive: the judge erred in overriding the jury's recommendation of a life sentence.[13] To sustain a jury override, this Court must conclude that the facts suggesting a sentence of death are "so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla.1975). In other words, we must reverse the override if there is a reasonable basis in the record to support the jury's recommendation of life. See, e.g., Scott v. State, 603 So.2d 1275, 1277 (Fla. 1992); Ferry v. State, 507 So.2d 1373, 1376 (Fla.1987).
The facts in this record show a reasonable basis on which the jury could have concluded that life imprisonment was the appropriate sentence. While the judge found that only two nonstatutory mitigating circumstances had been established, the jury could have reasonably concluded that San Martin's borderline intelligence and the lesion on his brain were nonstatutory mitigating circumstances. See Amazon v. State, 487 So.2d 8, 13 (Fla.1986) (finding that jury could have reasonably concluded that defendant's emotional problems constituted mitigating circumstances even though trial judge found no mitigating factors). These factors were established by the testimony and evaluations *472 of Drs. Herrera and Lourenco. The State's expert Dr. Mutter did not dispute these findings at the presentencing hearing before the judge and even conceded that San Martin's reasoning was impaired. Cf. Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990) ("[W]hen a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved."). Dr. Mutter only disagreed with the defense experts' conclusions that the impairment rose to a level that would prevent San Martin from understanding the consequences of his actions.
Most significantly, however, the jury could have based its recommendation on the circumstances of the murder. See Jenkins v. State, 692 So.2d 893, 895 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 311, 139 L.Ed.2d 240 (1997). While San Martin was clearly an active participant in the robbery of the bank, he was not armed and fired no shots at the victim. The trial judge concluded that the fact that San Martin was not the triggerman did not constitute a nonstatutory mitigating circumstance. The jury, however, could have reasonably relied upon this fact in recommending a life sentence for San Martin. See Barfield v. State, 402 So.2d 377, 382 (Fla.1981) (finding that jury override was improper because there was a reasonable basis for the jury's recommendation of life imprisonment where defendant was a middleman in a contract murder and did not participate in the actual killing). In fact, the variation in the three codefendants' active participation in the shooting provides a reasonable explanation for the jury's disparate sentencing recommendations: life for San Martin, but death for Franqui and Gonzalez. Thus, we conclude that the judge improperly overrode the jury's recommendation of a life sentence.

Conclusion
For the reasons expressed above, we affirm San Martin's convictions but vacate his death sentence and remand for imposition of a life sentence without possibility of parole in accordance with the jury's recommendation.[14]
It is so ordered.
KOGAN, C.J., OVERTON and SHAW, JJ., and GRIMES, Senior Justice, concur.
WELLS, J., concurs as to the conviction and concurs in result only as to the sentence.
HARDING, J., dissents with an opinion.
ANSTEAD, J., dissents.
HARDING, Justice, dissenting.
For the reasons expressed in my dissenting opinion in Franqui v. State, 699 So.2d 1332 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1337, 140 L.Ed.2d 499 (1998), and cert. denied, ___ U.S. ___, 118 S.Ct. 1582, 140 L.Ed.2d 797 (1998), I dissent from the majority's resolution of the jury selection issue regarding juror Diaz. Id., 699 So.2d at 1339-43 (Harding, J., dissenting). Because I conclude that San Martin's peremptory challenge was improperly denied, I would reverse his convictions and remand for a new trial.
NOTES
[1] After its opening statement, the State filed a nolle prosequi as to one count of aggravated assault and the charge of unlawful possession of a firearm during a criminal offense.
[2] At the time that the detective questioned San Martin about the weapons, the police did not know that the same weapons had been used in both the Lopez and Bauer incidents. The police learned that the weapons were used in the Bauer shooting only after the weapons were recovered and ballistic tests were conducted.
[3] The jury recommended and the judge imposed the death sentences on both Franqui and Gonzalez. On appeal, this Court affirmed their convictions, but vacated the death sentences and remanded for new penalty phase proceedings because of the erroneous admission of the codefendants' statements that implicated each other as the aggressor. Gonzalez v. State, 700 So.2d 1217, 1219 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1393, 140 L.Ed.2d 652 (1998); Franqui v. State, 699 So.2d 1332, 1336 (Fla. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1337, 140 L.Ed.2d 499 (1998), and cert. denied, ___ U.S. ___, 118 S.Ct. 1582, 140 L.Ed.2d 797 (1998).
[4] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In Enmund, the United States Supreme Court held that the Eighth Amendment of the United States Constitution does not permit imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797, 102 S.Ct. 3368. In Tison, the Supreme Court held that "major participation in the felony committed, combined with reckless indifference to human life is sufficient to satisfy the Enmund culpability requirement" for imposing a death sentence under a felony murder theory. 481 U.S. at 158, 107 S.Ct. 1676.
[5] San Martin was questioned about the instant case and the Lopez killing over the course of one interview session conducted by several police detectives. He confessed his involvement in both incidents during that interview session. He moved to suppress his statements in both the Lopez trial and the instant trial. In both instances he attacked the voluntariness of the statements obtained during the interview and claimed that the statements were obtained in violation of his right to counsel and right against self-incrimination.
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).
[7] The trial court conducted an evidentiary hearing in the Lopez case after San Martin made a motion to suppress his statements relating to that case. In the instant case, San Martin and Franqui stipulated that the testimony of witnesses as to the interview process would be the same as that heard in the Lopez suppression hearing. In the direct appeal of San Martin's conviction and sentence in the Lopez case, this Court reviewed the testimony and evidence presented at that hearing and concluded that the record supported the trial court's finding that San Martin's statements were knowingly and voluntarily made. San Martin v. State, 705 So.2d 1337, 1344-45 (Fla.1997).
[8] The court heard new testimony concerning San Martin's January 21, 1992, interrogation about the location of the weapons and Gonzalez's statements made on January 18, 1992.
[9] See Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (reversing general guilty verdict under a California statute that prohibited the flying of red flags on three alternative grounds, one of which violated rights guaranteed by the First Amendment).
[10] See Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957) (reversing general guilty verdict for conspiracy where one of the possible bases for conviction was legally inadequate because of a statutory time bar).
[11] As provided in section 775.0823(1), Florida Statutes (1991), the penalty for the first-degree murder of a law enforcement officer, which "arises out of or in the scope of the officer's duty as a law enforcement officer," is life imprisonment without eligibility for release, if the death sentence is not imposed. If Officer Bauer had not been engaged in his duties as a law enforcement officer at the time he was shot, then the possible penalties could be death or life imprisonment without the possibility of parole for twenty-five years. See § 775.082(1), Fla. Stat. (1991).
[12] Section 921.141(5)(j), Florida Statutes (1991), provides that it is an aggravating circumstance if "[t]he victim of the capital felony was a law enforcement officer engaged in the performance of his [or her] official duties."
[13] Our disposition of this issue, renders moot San Martin's remaining penalty phase issues (issues 8, 9, and 11-13).
[14] As explained in footnote 11, supra, if the death sentence is not imposed, the penalty for first-degree murder of a law enforcement officer is life imprisonment without eligibility for release. See § 775.0823(1), Fla. Stat. (1991). Because the jury's guilt-phase verdict specifically found that Steven Bauer was a law enforcement officer, there were two possible jury sentencing recomendations: death or life imprisonment without possibility of parole. The jury recommended the life sentence for San Martin.