VILLANTI, Judge,
Dissenting.
Because my review of the record and law supports the trial court’s order denying the motion to suppress, I respectfully dissent.
The majority’s decision is based primarL ly upon its conclusion that “the State did not elicit specific and articulable facts that warranted the search.” Although I agree it would have been helpful for the State to present a more detailed picture of the facts preceding the search, including the exact manner in which generic searches are conducted at the onset of each day, this deficiency does not require reversal of the trial court’s denial of the motion to suppress as a matter of law.
The facts in evidence, particularly considered under the totality of the circumstances, amply support the denial of the motion to suppress. For example, although not specifically noted by the majority, during the time when Mr. Arroyo stepped out of the room to supervise hallway traffic, S.V.J. and another student were left unattended. In my view, as undoubtedly the trial court’s, that fact was not insignificant. During that interlude it is not difficult to imagine the prospect of improper conduct occurring by one or both of these students. Although it was not routine procedure to search students following a fight, there is no indication these students were aware of that fact and were not conspiring to get rid of evidence certain to be discovered at what they perceived was an imminent search. The fact that these students were both attendees at an alternative school, which by definition catered to disruptive students, only heightens the reasonableness of the ensuing search, independent of the fact that the post-fight discipline/review had not even begun.
S.V.J.’s startled look when Mr. Arroyo returned, coupled with her immediate attempted concealment of her purse, under these circumstances, connotes more than innocuous behavior. Mr. Arroyo’s eigh *1225 teen years of experience, facing “daily challenges” with unruly students, including “[s]tudents bringing in blades, knives, becoming violent on site, these types of situations,” would naturally cause him to assess S.V.J.’s behavior as giving rise to suspicion that something was amiss. As succinctly put by the trial court, “[fjrom [S.V.J.’s] entire demeanor, everything told [Mr. Arroyo] that he had reason to be concerned.” This is substantial, competent evidence supporting the trial court’s determination that Mr. Arroyo had reasonable suspicion, and thus the trial court’s order should be upheld. See San Martin v. State, 717 So.2d 462, 469 (Fla.1998).
The majority, in effect, applies a stricter standard than the law mandates, requiring school personnel to have the same level of training as police officers to ferret out— and articulate under oath — those details police officers have learned will give rise, legally, to “reasonable suspicion.” Common sense tells us that what is meant legally by “reasonable suspicion” will not always translate perfectly in the school setting where a fair-minded teacher or administrator is attempting to provide enough order that education may take place, not patrol the hallways in search of those who are in breach of the peace. “[M]aintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures.... It is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject.” New Jersey v. T.L.O., 469 U.S. 325, 340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).
Additionally, to require Mr. Arroyo to identify the exact rule or statute S.V.J. was suspected of violating would not be a reasonable application of the flexible standard T.L.O. says we should apply. Mr. Arroyo’s reasonable suspicion was not based on a whim or “mere hunch” but was the result of his perception of S.V.J.’s furtive'movements to conceal her purse and startled look through the lens of his eighteen years of experience dealing with troubled students. “[S]chool authorities have a layman’s familiarity with the types of crimes that occur frequently in our schools: the distribution and use of drugs, theft, and even violence against teachers as well as fellow students.” T.L.O., 469 U.S. at 350 n. 1, 105 S.Ct. 733 (Powell, J., concurring). In other words, S.V.J’s conduct was consistent with a myriad of improper purposes, and the fact that Mr. Arroyo could not specifically state which violation S.V.J.’s conduct showed she was trying to hide does not make his layman’s suspicion any less valid. “A teacher’s focus is, and should be, on teaching and helping students, rather than on developing evidence against a particular troublemaker.”' Id. at 353, 105 S.Ct. 733 (Blackmun, J., concurring).
Finally, there is another ground to uphold the search. Because students at this school are subject to search upon entering each morning, I see no reason to require reasonable suspicion for further searches during the day. The alternative nature of this school required Fourth Amendment waiver, implicitly or explicitly, as a condition of admission. There was, simply put, no genuine expectation of privacy to protect here. Cf. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 657, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (noting that students have a lesser expectation of privacy than members of the general population and that student athletes (a subclass of regular students) have an even lesser expectation). If students at an ordinary school have a lesser expectation of privacy than members of the general population, it necessarily follows that students who have been selected for inclusion, because of their disruptive, risk-provoking behavior, for placement at an alternative school have *1226 an even lesser expectation of privacy. Thus, the search for contraband should not be protected under the circumstances of this case. To do so would place alternative schools on the same footing as mainstream schools, which would clearly defy the purpose of having an “alternative” school in the first place.