922 So.2d 438 (2006)
John Edward DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. 5D05-2173.
District Court of Appeal of Florida, Fifth District.
March 10, 2006.
*440 James S. Purdy, Public Defender, and David S. Morgan, Assistant Public Defender, Daytona Beach, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Anthony J. Golden, Assistant Attorney General, Daytona Beach, for Appellee.
PLEUS, C.J.
John Edward Davis appeals his convictions for first degree (premeditated and felony) murder and robbery. He argues first that the trial court erred in denying his requested jury instruction on taking property of the victim as an afterthought, which constitutes theft, as opposed to taking property in the course of a robbery. Second, Davis, who was 16 years old at the time of the murder, claims that the trial court erred in failing to suppress his confession because police continued to interrogate him after he asked to speak to his mother.
We find that the trial court abused its discretion in denying Davis's requested afterthought instruction where there was some evidence presented to support his theory. Consequently, the robbery conviction is reversed and we remand for a new trial on that charge. However, we affirm the first degree murder conviction. Any error relating to the felony murder charge, which was based on the robbery charge, was harmless because the jury also found Davis guilty of premeditated murder.
Regarding the confession, the trial court properly denied Davis's motion to suppress. Davis's mother was properly notified that he was being interrogated and did not ask to see him, did not ask for questioning to cease and did not ask that Davis have an attorney present. Additionally, the trial court correctly concluded that Davis's requests to speak to his mother after the interview was finished were not an invocation of his right to stop the interview until a parent could be present.

Facts
Davis was charged as an adult by grand jury indictment with the first degree murder and robbery of Paul Prescott on or about December 13 or 14, 2003. The indictment alleged that Davis killed Prescott by shooting him several times, acting from a premeditated design to kill or while engaged in robbing Prescott. The robbery charge alleged that Davis robbed Prescott of a "motor vehicle, and/or a cell phone, and/or cash or currency."
*441 A week before the murder, Davis told his girlfriend, Alix Fideli, that he planned to rob someone for money. He needed money to give to his mother's boyfriend. About that same time, Davis obtained a handgun. Davis told Fideli he was going to use the gun as a prop in the robbery.
One or two days before the murder, Davis went with Fideli and Christopher Sunter to a pawn shop where Sunter purchased a box of .380 caliber bullets for Davis. The night before the murder, Davis was with Andrew Pine. Davis showed Pine a handgun that night. Pine identified the murder weapon as the gun that Davis showed him the night before the murder.
On the night of the murder, Davis, his 13-year-old brother, Torrey, and Paul Prescott were hanging out together at the Davis home. They were drinking alcohol and smoking marijuana. Davis, Torrey and Prescott went to buy beer and look for a boat launch in Sanford. They returned to the Davis home and continued drinking. Around 11:30 p.m., Davis and Prescott left without Torrey.
About 11:50 p.m., Torrey called Davis on his cell phone and told him to come pick him up. Davis returned in Prescott's pickup truck and took Torrey to French Landing, a nearby boat launch. Davis told his brother that Prescott had "tried him and he had to do it." Torrey observed Prescott lying on his stomach. Davis asked Torrey for help disposing of Prescott's body but Torrey did not help Davis because he was scared. Davis took Torrey back home. Torrey told their mother, who called 911.
Torrey disavowed several portions of a written statement he made to police shortly after the murder, including his comments that (1) Prescott had a lot of money in his truck; (2) Davis told Torrey he was going to rob Prescott; and (3) Davis showed Torrey a .380 caliber handgun.
After dropping off his brother, Davis drove Prescott's truck to his girlfriend's house. Fideli observed blood on the truck. Police arrived at Fideli's house and Davis ran into the nearby woods. Police later apprehended Davis and seized from him $136 in currency, Prescott's truck and house keys, and five .380 caliber bullets. They later found the handgun and a cell phone nearby in the woods.
The medical examiner testified that Prescott had been shot four times. He classified Prescott's death as a homicide resulting from multiple gunshot wounds. After his arrest, Davis told Fideli he shot Prescott four times. He also told Fideli what to say to police and that she lied to police "about the whole Manny thing."

The Confession
Case agent Greg Seymour interrogated Davis. The interview was videotaped and transcribed. Initially, Davis told Seymour that a friend named Ryan picked him up in Prescott's truck, then he dropped Ryan off and drove the truck to his girlfriend's house where he was apprehended. After Seymour advised Davis that he knew Prescott was dead, Davis became upset and stated, "I wanna talk to my mom before I leave." Seymour responded, "Okay, alright."
After further discussion, Davis changed his version of the events, stating that he was acting as the middleman in a drug deal. He was supposed to buy three pounds of marijuana from Prescott for another guy. Prescott tried to rob him of the guy's money. Prescott then tried to pull away. Davis shot Prescott because he did not want Prescott to get away with the money and have the guy who owned the money kill him. Davis figured sitting in jail alive was better than getting killed.
*442 Seymour explained to Davis that there was a big difference between a cold hearted killing and a drug deal gone bad. At that point, the following exchange occurred:
Davis: Man, I'll tell you the whole story.
Seymour: Okay.
Davis: But when I'm done, I wanna talk to my mom.
Seymour: Okay.
Davis: Are you callin' my mom?
Seymour: Yes, we're getting' in touch with her now.
Davis: What do ya wanna know?
Davis elaborated on his drug deal story. He explained that the name of the guy involved in the drug deal was "Manny." Then, the following exchange occurred:
Willis: [another police investigator] Let me interject somethin' real fast here, okay.
Seymour: Mm hmm.
Willis: We are attempting to get ahold of your mother, okay. You mentioned before you wanted to try and get ahold of her before you left here and, then, you asked about her just a few minutes ago, okay. So, we are attempting to get ahold of her. It's my understanding, but I'm not sure, she knows you are here. With that in mind, you're still comfortable talkin' to us, right?
Davis: Yeah. Just so I can talk to my mom when I'm done.
Willis: When you're done, you wanna talk to 'er?
Davis: Yeah.
Willis: Okay.
Seymour: You can talk to 'er any time, you know what I mean. When you're done is your thing.
Davis: I just want talk to my mom tonight before I go to jail.
After more questioning, the following exchange occurred:
Seymour: How do ya feel right now about all this?
Davis: I don't feel good. I feel like I'm goin' to jail for life and, now, I have nothin' to worry about (unintelligible), so really, I'm at the end of my rope. All I wanna do is talk to my mom.
Seymour: Okay.
Davis: That's all I want. I just wanna talk to my mom.
Seymour: Okay. We're gonna make that happen. The reason I'm askin' all that though is.
Davis: Can I see 'er again, too.
Seymour: Can you what?
Davis: Can I see 'er again before I leave?
Seymour: Yeah.
Davis: Can she come here?
Seymour: Well, I think she's on her way here now, okay.
Davis: I wanna see 'er before I go.
Shortly after that, the following exchange occurred:
Davis: I wanna talk to my mom. Do you have the number to call her?
Willis: I'll write it down.
More questioning occurred. Then, the following exchange occurred:
Davis: Can I talk to my mom?
Willis: That's why (unintelligible) stepped in so he can get everybody lined up and get contact with everybody.
Davis: Will I be able to talk to everybody before I leave?
Davis filed a motion to suppress his confession. He argued that his confession was involuntary, in pertinent part because police did not honor his request to speak to his mother before continuing to question him. At the suppression hearing, Deputy *443 Robert Carrow testified that he was dispatched to Davis's house where he spoke with Davis's mother. He told her that her son was in police custody. She did not ask to speak to Davis or invoke any type of parental rights. Investigator John Eckersen also spoke to Davis's mother. He advised her that Davis was at the operations center. She did not ask to speak with Davis or request that an attorney be present. Investigator Seymour testified that he interpreted Davis's statements regarding his mother to mean that he wanted to speak with her at the end of the interview. The lower court denied the motion to suppress.
The standard for reviewing a trial court's denial of a motion to suppress is mixed. Dewberry v. State, 905 So.2d 963, 965 (Fla. 5th DCA 2005). Its fact findings will be upheld if supported by competent, substantial evidence. Id. In reviewing the trial court's fact findings, the appellate court must construe all the evidence, and reasonable inferences therefrom, in a manner most favorable to upholding the trial court's decision. Id. The trial court's application of the law to the facts is reviewed de novo. Id.
Davis argues that the trial court erred in denying his motion to suppress because police continued to question him after he asked to speak to his mother. If, during a custodial interrogation, a juvenile "indicates to police that he or she does not wish to speak to them until he or she has had an opportunity to speak with parents, the questioning must cease." Frances v. State, 857 So.2d 1002, 1004 (Fla. 5th DCA 2003).
The trial court was well aware of this rule of law but correctly found that it did not apply in this instance. Instead, the trial court found that "[Davis'] requests to speak with his mother after the interview, or before he left for a commitment program or detention, were not an invocation of a desire to stop the interview until a parent was present." The court's fact finding was supported by competent, substantial evidence. The transcript clearly demonstrates that Davis repeatedly asked to see his mother after the interview. Police were not required to cease questioning.
Davis also argues that his confession was rendered involuntary when his requests to speak to his mother are considered in combination with his young age and his language skills. The record does not support this argument. Although Davis was only 16 years old at the time, he had a long history with the police, which was discussed during the interview. Additionally, the interview transcript demonstrates that Davis clearly understood his situation and the questions posed by the police. His language skills were entirely adequate.
At most, the trial court arguably erred in failing to redact the final portions of the interview, which occurred after Davis asked to speak to his mother without qualification. However, these unqualified requests came at the very end of the interview, after the cat was out of the bag. Any error in admitting the remainder of the interview was harmless.

The Afterthought Instruction
Before trial, Davis filed "Defendant's Requested Jury Instruction Re: Taking of Property as an Afterthought." The requested instruction read: "If the evidence shows that the taking of property occurred as an afterthought to the use of force or violence which resulted in the death of the victim, the taking does not constitute robbery, but may still constitute theft." Id.
*444 During trial, Davis renewed his request for the afterthought instruction, which was denied. At the conclusion of the jury charge, Davis objected to the court's failure to give his requested afterthought instruction.
The giving or withholding of a requested jury instruction is reviewed under the abuse of discretion standard of review. Worley v. State, 848 So.2d 491, 492 (Fla. 5th DCA 2003). However, in a criminal proceeding, the trial court's discretion in this regard is rather narrow because a criminal defendant is entitled to have the jury instructed on his or her theory of defense, if there is any evidence to support this theory, and so long as the theory is recognized as valid under the law of the state. Id.
Davis argues that the trial court abused its discretion by denying his requested instruction on the afterthought theory. He is correct. In Perkins v. State, 814 So.2d 1177 (Fla. 4th DCA 2002), the defendant was convicted of first degree murder "on evidence which would have supported the separate charges of premeditated or felony murder." Id. at 1178. Although the appellate court acknowledged there was ample evidence to support the conviction under either theory, it found that the defendant "testified to a different version of events," which, if believed by a jury, would have amounted to a killing in self-defense and subsequent theft of the victim's property as an afterthought. Id. Based on this evidence, the defendant unsuccessfully sought to have the jury instructed that if the defendant took the victim's property to effect his escape, or as an afterthought to the use of force, the taking may constitute a theft, but not a robbery. If this theory were believed by the jury, the robbery necessary to support the felony murder theory would be negated.
The appellate court reversed the denial of this instruction and remanded for a new trial on the murder charge. The court rejected the State's argument, also made in the instant case, that the standard jury instruction for robbery was sufficient to explain the afterthought concept. Perkins demonstrates that afterthought is an established legal theory and that where there is some evidence to support it, a requested instruction should be given. Accordingly, Perkins requires reversal of the robbery conviction because there was evidence to support the afterthought theory. Namely, Davis told Investigator Seymour that the killing resulted from a drug deal gone bad, not a robbery.
Perkins does not require reversal of the first degree murder conviction. As noted above, the court in Perkins noted that the defendant's murder conviction rested "on evidence which would have supported the separate charges of premeditated or felony murder." Id. at 1178. In the instant case, however, the jury found Davis guilty of both premeditated and felony murder. "While a general guilty verdict must be set aside where the conviction may have rested on an unconstitutional ground or a legally inadequate theory, reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient." San Martin v. State, 717 So.2d 462, 470 (Fla.1998).
The principle enunciated in San Martin applies in the case of a general verdict, but even more so in a case such as this one, where the jury expressly found Davis guilty under both theories. Davis does not adequately challenge the premeditation theory. He makes a brief reference to premeditation in his initial brief, arguing that "there simply was no competent evidence *445 that the victim had any money for the defendant to fulfill his alleged plan to rob money from the victim." Apparently, Davis confuses premeditation as an element of robbery instead of murder. At any rate, Davis never formally challenges the evidence to support premeditation by way of raising it as a formal issue on appeal. "[I]n order to obtain appellate review, alleged errors relied upon for reversal must be raised clearly, concisely, and separately as points on appeal." Florida Emergency Physicians-Kang & Assocs., M.D., P.A. v. Parker, 800 So.2d 631, 636 (Fla. 5th DCA 2001) (quoting Singer v. Borbua, 497 So.2d 279, 281 (Fla. 3d DCA 1986)).
Even if Davis had sufficiently challenged the premeditation theory, there is competent, substantial evidence from which the jury found Davis guilty of premeditated murder. Premeditation may be established by circumstantial evidence, and in particular, may be inferred by the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted. Green v. State, 715 So.2d 940, 944 (Fla.1998). In the instant case, there was evidence that a week before the murder, Davis obtained a handgun and some bullets of the same caliber. Davis planned to use the handgun as a "prop" in a robbery. Davis was seen with the handgun the night before the murder. Davis shot Prescott at least four times in vital organs at close range. Davis later drove Prescott's truck to his girlfriend's house, where police caught him. Police confiscated $136 and several .380 caliber bullets in Davis's possession. They recovered the murder weapon and Prescott's cell phone nearby. These facts establish sufficient evidence to support the first degree premeditated murder conviction independent of the error relating to the felony murder conviction. San Martin.
Accordingly, we affirm the murder conviction but reverse the robbery conviction and remand for a new trial if so desired.
FIRST DEGREE MURDER CONVICTION AFFIRMED; ROBBERY CONVICTION REVERSED AND REMANDED FOR NEW TRIAL.
SAWAYA and ORFINGER, JJ., concur.