CORTIÑAS, J.
In the early morning hours of an October day, Michael Morris (“Morris”) and his friend, Nigel Whatley (“Victim”), exited a nightclub and walked to a parking lot where Morris intended to show his new car to the Victim. After arriving at the vehicle, which was parked next to a street light, Morris and the Victim began talking and were approached by the defendant. The defendant demanded that they hand their money over to him. After a brief argument between the three men, Morris threw his money and car keys on to the floor, but the Victim told the defendant that he would have to shoot him. The defendant then pulled out a gun.
By chance, a car drove by at that moment and the defendant briefly lowered his weapon. The Victim and Morris took advantage of this and pounced on the defendant. During the fight, the Victim was shot and fell face down to the ground. Morris attempted to crawl away, but was shot in the chest by the defendant. After being shot, Morris observed the defendant go over to the Victim, and although the Victim was still lying face down on the ground, the defendant shot him again. Morris attempted to escape but was shot by the defendant in the leg. Nevertheless, Morris managed to make it to a nearby restaurant where he was found by a police officer and was rushed to a hospital. Morris provided a physical description of his assailant to the police. After investigating the scene of the crime, the police located a black skully cap approximately 11 feet from the Victim’s body. The DNA found *695 on the skully cap matched that of the defendant.
Approximately nine months later, on July 21, 2006, Detective Nanni met with Morris outside of his workplace and showed him a photo array. Morris identified the defendant, but did not sign the array. Two days later, on July 23, 2006, Morris met with Detective Nanni at the detective’s office, again identified the defendant, and this time, in the course of a sworn statement, signed the photo array.[1] In his statement, Morris specified that the defendant had been wearing a skully cap at the time the crime was committed. Morris qualified his identification, however, by stating that he “was 60 percent certain” that the individual he selected from the array “is the person who shot [him] and murdered [the Victim].” He was not advised of the DNA match prior to making his identification. At trial, Morris explained:
I put 60 percent because I tend to quantify things based on my background. I am trained as a chemist; and it shows his face but it doesn’t show someone wearing a [skully]. And to be fair, and in an abundance of caution, I said 60 percent.
Morris also affirmed that he would have been more comfortable identifying the photographs if the individuals pictured had been wearing skully caps.
When the defendant was first told by Detective Nanni that his DNA had been recovered near the Victim’s body, he denied being at the crime scene at the time of the murder. Shortly thereafter he told the detective that he had been at the club, but had only been there to pick up a generator from his friend in the wake of a hurricane in late October 2005.[2] The defendant was unable to provide the name of his friend when asked by the detective.
At trial, the defendant’s then-girlfriend testified that she was at the club with the defendant on the date of the murder. She testified that prior to' entering the club, the two had parked outside and she applied make-up while the defendant removed a black skully cap and a white “do-rag” from his head in order to brush his hair. According to her, the defendant placed the white do-rag back on his head but put the black skully cap on his lap. She did not know what happened to the skully cap after they exited the car.
The girlfriend further testified that she remained at the club with the defendant until very near closing time, which happens to coincide with the approximate time of the incident. She stated that she and the defendant left the club in the defendant’s ear, and after driving for a few minutes received a call from her friend, “Blinky,” who told her someone had been shot near the club. The girlfriend further testified that based on the description she received from Blinky, she feared one of her friends had been shot at the club and, therefore, she returned to the scene with the defendant. Upon arriving at the scene, she claims to have called 911 twice, but hung up on both occasions because the 911 operator was “acting confused.” *696 There is no record of these alleged 911 phone calls. When asked the identity of the friend she believed had been shot, the girlfriend responded that his nickname was “Yellow.” When questioned about Yellow’s identity, she could not provide an actual name for this person. The girlfriend never presented her account of the events to the police, despite the investigation and subsequent arrest of the defendant. She said absolutely nothing about a supposed generator that the defendant had claimed to be picking up at the nightclub and, contrary to what the defendant had told the police, placed the defendant at the club during the early morning hours of the day of the murder.
During the State’s closing argument, the prosecutor stated:
And the defendant is the one who says, I go to the club to get the generator, that’s got to be how my [skully cap] gets there. The detective says, well, okay, if that’s your explanation to us, let’s put it on the record, let’s bring the steno in here, put it on tape, let’s make a record of what you just told me and that will be the end of that.
You don’t have that record, you don’t have that stenographic transcript, you don’t have a tape, because at that point the defendant said, no, I’m done.
That is basically the [S]tate’s evidence. You might want more, but that’s the [S]tate’s case.
Arguing that the State improperly commented on the defendant’s right to silence, the defense moved for a mistrial, which the trial court denied. After considering the evidence presented at trial, the jury found the defendant guilty of 1) second degree murder as a lesser included charge of premeditated first degree murder, 2) attempted first degree murder, 3) armed robbery, and 4) attempted armed robbery.
The defendant then filed a motion for a new trial arguing the sufficiency of the evidence, that the verdict was contrary to the weight of the evidence and the law, and that the court erred in denying the motion for mistrial based on the State’s comments regarding the defendant’s right to silence. At the hearing on the motion for a new trial, the trial court sua sponte announced that it wanted Morris and the girlfriend to submit to a polygraph test. The trial court added: “So, at this point you know that I’m preliminarily, anyway, headed towards a denial of your motion for new trial. However, on the issue of identification, if there are, you know, two polygraphs are done, and I want Mr. Morris’ polygraph done.” The court subsequently advised the parties that it wanted Detective Nanni, not Morris, to take the polygraph test. The State, however, objected and neither the detective nor Morris took the test.
Despite ordering the polygraph tests, the trial court unequivocally stated:
I’m inclined to deny the motion for new trial. I’m serious, I want you all understanding I’m inclined to deny it but I do want to give every opportunity, because I.D. cases are so important, so crucial.
Approximately three weeks later, another hearing was held and the defense submitted to the court the results of the polygraph tests of the defendant and the girlfriend.[3] The State filed a motion in opposition to both the polygraph tests and to the motion for new trial. Acknowledging that Detective Nanni had not taken the polygraph test, and prior to ruling *697 on the motion for new trial, the court told the parties:
[J]ust so that we are both clear, I can’t force anybody to take the polygraph ... [H]owever, just so that we are clear, the fact that the defendant took a polygraph test and passed it ... the fact that the alibi witness took and passed the polygraph ... that I’m not considering it in any capacity whatsoever for purposes of the hearing today; just so that we are all clear. I saw the State’s memorandum in opposition to it. I’m telling you all no, that that will not be considered in the motion or in the ruling on the motion.
The trial court then granted the motion for a new trial on the bases that the verdict was contrary to the weight of the evidence and that the State had improperly commented on the defendant’s right to silence. We reverse.
The trial court’s order granting the motion for a new trial is reviewed for a clear abuse of discretion. State v. Riggins, 314 So.2d 238, 240 (Fla. 4th DCA 1975). Furthermore, “when hearing a motion for new trial predicated on the verdict being contrary to the weight of the evidence the trial court must base its decision solely on the record and the evidence upon which the jury reached its verdict.” Id. (citing State v. Jones, 281 So.2d 220 (Fla. 4th DCA 1973)). Here, Morris was able to identify the defendant from a photographic array and, in the course of his sworn statement to the police, specified that the defendant was wearing a skully cap at the time the he and the Victim were robbed and shot. The police found a matching skully cap containing the defendant’s DNA approximately 11 feet away from the Victim’s body. The defendant first denied being present at the scene of the crime and later admitted to having been there, but was unable to provide any corroboration for his explanation that he was there to borrow a generator from an unidentifiable friend.
Several elements of the girlfriend’s testimony were equally unverifiable; she was unable to provide the name of either the person who allegedly called to tell her about the shooting or the friend who she claims she believed had been shot. Additionally, the cell phone records that would have proven that the girlfriend made the 911 calls were no longer available from the girlfriend’s cell phone provider and records of the calls were also unavailable from 911. It was well within the province of the jury to weigh the evidence, determine the credibility of the testifying witnesses and the evidence presented and arrive at the verdict.
The trial court erred in sua sponte asking certain witnesses and parties to submit to polygraph examinations in order to assuage its concerns over the identification of the defendant. In Florida, “polygraph evidence is inadmissible absent a stipulation between the parties.” Austin v. State, 679 So.2d 1197, 1199 (Fla. 3d DCA 1996); see Davis v. State, 520 So.2d 572 (Fla.1988). Fonticoba v. State, 725 So.2d 1244, 1245 (Fla. 3d DCA 1999). More specifically,
The courts of this state have repeatedly held that the factors contributing to the results of a polygraph test — the skill of the operator, the emotional state of the person tested, the fallibility of the machine, and the lack of a specific quantitative relationship between physiological and emotional states — are such that the polygraph cannot be recognized as a sufficiently reliable or valid instrument to warrant its use in judicial proceedings unless both sides agree to its use.
Davis, 520 So.2d at 573-74. Here, there clearly was no stipulation between the parties and the State strongly opposed the *698 use of the polygraph examinations. Although the trial court asserted that it was not going to rely upon the results of the polygraph examinations, absent their consideration, it is extremely difficult to reconcile the sharp contrast in the trial court’s original emphasis on its inclination to deny the motion for a new trial and its subsequent granting of the motion. It is entirely clear from the record that the trial court requested the polygraphs, reviewed the results, and was, at least, minimally influenced by the polygraphs in arriving at its decision. The trial court abused its discretion in both requesting the examinations and reviewing their results prior to ruling on the motion for a new trial. Because this evidence was not considered by the jury in reaching its verdict, it could not be considered or relied upon by the trial court in determining that the jury verdict was contrary to the weight of the evidence. Riggins, 314 So.2d 238. It was error for the trial court to grant a new trial on this basis.
We also find that the trial court erred in ruling that the statements by the State during closing argument constituted improper comments on the defendant’s right to silence. Taken in the context of the State’s closing argument, the statement that “[y]ou don’t have that record, you don’t have that stenographic transcript, you don’t have a tape, because at that point the defendant said, no, I’m done. That is basically the [Sjtate’s evidence. You might want more, but that’s the [Sjtate’s case,” was merely highlighting the refusal of the defendant to give a recorded statement to the police. Under Florida law, addressing a defendant’s refusal to have his statements to the police recorded does not constitute an infringement on the defendant’s right to silence. See San Martin v. State, 705 So.2d 1337 (Fla.1997) (Explaining that because the accuracy and integrity of oral incriminating statements are often targeted by defense counsel, “[i]t is only reasonable that the State be permitted to elicit the fact that the accused was given the opportunity [to put his statement in writing] and declined.”) (quoting McCoy v. State, 429 So.2d 1256, 1257 (Fla. 1st DCA 1983)); Brack v. State, 919 So.2d 578, 580 (Fla. 4th DCA 2006) (“[T]he comment that the defendant declined to have his statement to the police recorded, after the defendant waived his Miranda rights and made a full statement, is not an impermissible comment on the defendant’s silence.”). As we have previously held:
Where ... a defendant has ... voluntarily given a statement to the police, it is not a comment on silence for the detective to explain that the defendant refused to memorialize the already-given oral statement in a tape recording. The defendant in such circumstances has already elected to speak. A refusal to write down, or record, what has already been said does not amount to invocation of the right to silence.
Fernandez v. State, 786 So.2d 38, 40 (Fla. 3d DCA 2001). Here, the State attorney was simply reiterating and highlighting the fact that the defendant had refused to give a recorded statement and, as a result, the only statements from the defendant available to the State were oral. Doing so, quite simply, did not constitute an improper comment on the defendant’s right to silence. Moreover, we note that when originally denying the motion for mistrial following closing arguments, the trial court said of the purported improper comments on defendant’s right to silence: “I never thought that was a comment on [defendant’s] right to remain silent.” Only after receiving the results of the polygraph examination and reviewing the trial transcript did the trial court rule that the statements constituted an improper com *699 ment on the defendant’s right to silence. Accordingly, a new trial should not have been granted on this basis.
Based upon the foregoing, we reverse the trial court’s order granting the motion for a new trial.
Reversed and remanded.

. Officer Nanni testified that Morris did not sign the photo array on July 21 because it was necessary that Morris do so during the course of a sworn statement. Detective Nanni arranged to have a stenographer present on July 23, 2006, because Morris had the day off from work.

. The murder of the Victim occurred on October 1, 2005. South Florida was impacted by Hurricane Katrina in late August 2005 and Hurricane Wilma in late October 2005. Although the defendant asserted that the hurricane occurred in late October 2005, this explanation could not account for the presence of his DNA outside the club the day of the murder.

. Although the court had not requested the polygraph examination of the defendant, the defendant had previously taken a polygraph test in conjunction with a motion for pretrial release.